[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 2, 2012
JOHN LEY
CLERK

No. 11-13992

_____

D. C. Docket No. 1:09-cv-01965-WSD

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellant,

versus

MORGAN KEEGAN & COMPANY, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 2, 2012)

Before BARKETT and HULL, Circuit Judges, and HINKLE,[*] District Judge.

PER CURIAM:

In this civil enforcement action, the Securities and Exchange Commission ("SEC") sued Defendant Morgan Keegan & Co. ("Morgan Keegan") for violating §§ 10(b) and 15(c)(1) of the Exchange Act, § 17(a) of the Securities Act, and SEC Rule 10b-5. The SEC alleges that, in the critical time period of late 2007 and early 2008, Morgan Keegan's brokers (1) misrepresented that auction rate securities ("ARS") were safe cash-equivalents with no liquidity risk and (2) despite myriad auction failures and significant trouble in the ARS market, continued to recommend ARS as short-term, liquid investments and failed to disclose the known liquidity risk. The district court granted summary judgment to Morgan Keegan. After review and with the benefit of oral argument, we vacate and remand for further proceedings.

## I. FACTUAL BACKGROUND

Defendant Morgan Keegan is an investment firm with more than 1,200 brokers and 300 offices throughout the southeast. The firm offers financial products and services, such as securities brokerage, asset management, financial

---

[*]Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

planning, mutual funds, securities underwriting, sales and trading, and investment advice. Morgan Keegan participated in the ARS market by underwriting and selling ARS that were AAA-rated, issued by municipalities, and tax exempt. Morgan Keegan underwrote approximately $1.1 billion of ARS. Morgan Keegan also sold ARS underwritten by other firms. This action centers on Morgan Keegan's sales of ARS.

## A. Auction Rate Securities

In the early 1980s, ARS were first offered for sale in the United States. ARS were generally issued as municipal bonds, corporate bonds, or preferred stock. By the beginning of 2008, there were approximately $330 billion of outstanding ARS.

ARS typically have long-term maturities, or no maturity at all. Yet, ARS were conceived as highly liquid investments designed to serve as an equivalent to money-market funds and are structured for short-term holding periods.

ARS have a floating interest rate (or dividend) that resets periodically. The interest rate (or dividend) for an issuance of ARS is reset through a "Dutch auction" that occurs every 7, 28, or 35 days, depending on the governing documents. In a Dutch auction, investors purchase and sell the securities at par value, typically $25,000 per share. In advance of an auction, a potential investor

submits a bid (or "buy order") to the managing broker–dealer (typically the underwriter of the issuance), specifying the number of ARS shares the investor wants to purchase and the minimum interest rate the investor will accept. Existing holders of ARS can submit "sell orders" to sell a specified number of shares at a certain interest rate, or "hold orders" to hold a specified number of shares.

An auction succeeds, or "clears," if investors submit enough "buy orders" to cover the "sell orders." In a successful auction, the "clearing rate" is the lowest interest rate that will cover all the "buy orders." The clearing rate applies to each buy order that is accepted, regardless of whether the buyer was willing to accept a lower rate.

An auction fails if there are insufficient buy orders to purchase all of the shares offered for sale. If an auction fails, the ARS interest rate resets to the "maximum rate" until the next auction, and all of the current holders continue to hold the securities, with minor exceptions. The maximum rate is usually either a fixed rate or a floating rate, depending on the governing documents. Although an auction failure means that the ARS investment is illiquid, the holder continues to receive interest payments at the maximum rate, which is intended to compensate the holder for the loss of liquidity until the next successful auction. In other words, even if an auction fails, the issuer must continue to make all interest

payments due to holders of the ARS.

Underwriters of ARS, such as Morgan Keegan, historically prevented auction failure by placing "supporting" bids to purchase, for their own accounts, the excess securities offered for sale. The underwriter then would typically hold these securities in its own inventory. Morgan Keegan, either as buyer or seller, submitted orders in auctions for its own account to help ensure the liquidity of its customers' ARS.

**B. 2008 Collapse of the ARS Market**

Historically, ARS auctions rarely failed, and the ARS market was a relatively safe and liquid market. Beginning in the second half of 2007, however, ARS auctions began to fail. In a November 2007 email, the head of Morgan Keegan's short-term products desk commented, "We are in a credit crunch & it will get worse before it gets better. . . Wall Street can't carry anymore [ARS] paper."

In early February 2008, auctions failed at increasing rates, restricting the ability of investors to liquidate their ARS and access their funds. This increased auction failure resulted from most ARS underwriters, other than Morgan Keegan, ceasing to place supporting bids. On February 8, 2008, the first auction co-brokered by Morgan Keegan failed. In an email sent that day, Frank Phillips,

Morgan Keegan's head of retail trading, stated that Morgan Keegan had suspended all buying of ARS from dealers other than Morgan Keegan. On February 9, 2008, Phillips sent an email to Kevin Giddis, the head of Morgan Keegan's retail fixed income trading desk, expressing concern about ARS auction failures and brokers' misunderstandings of ARS:

> The [ARS auction] fail[ures] have potential to kill consumer confidence and could cause a panic to sell based on fear of losing liquidity. If this scenario of yelling fire in a crow[ded] room plays out, then other types of auction rate securities will begin to fail and I fear, will show that a lot of brokers have misrepresented [the] product to their clients.
> Being that I trade the auction rates, I know a lot of brokers do not understand the product fully and do not know what a failed auction means. If the broker doesn't understand what a failed auction is, do you think the customer does? Unfortunately, I don't think so.

By February 12, 2008, there were approximately 100 failures in auctions in which Morgan Keegan played some participating role (although not as lead manager).

On February 13, 2008, many major ARS underwriters stopped supporting auctions, and auctions failed on a widespread basis. On February 15, 2008, Giddis sent Morgan Keegan's brokers an email titled "AUCTION-RATE UPDATE-PLEASE READ." The email included an attachment describing the state of the ARS market and states, "Share the information with your customer but please don't send out." Marked for internal use only, the attachment describes the ARS market issues as "liquidity-driven" rather than "credit-driven," and includes

6

background information about what happens when an auction fails. In a section titled "Advice to Investors and Financial Advisors," the attachment states that "the credit quality of the auction rate market remains strong" and that no investor has lost principal on a deal in which Morgan Keegan was involved. The attachment further advises brokers to avoid the "impulse" to sell their customers' ARS:

> We stress the importance of ignoring the impulse to "test" the process by selling your clients' ARS holdings in a wholesale manner simply because you or your clients might be worried you will not be able to sell them; we maintain our commitment to supporting the ARS market to the extent possible, but this is only possible with your cooperation. Remember, your clients are being well-compensated for holding their ARS positions and the liquidity concerns should eventually sort themselves out.

Morgan Keegan continued to support auctions by buying ARS for its own account and thereby provided liquidity for its ARS customers. As a result, Morgan Keegan's ARS inventory increased from $18 million to $54 million by February 8, 2008, to $133 million by February 15, 2008, to $179 million by February 21, 2008. On February 22, 2008, Giddis again emailed Morgan Keegan's brokers and noted that some auctions were still succeeding and that none of the auctions for which Morgan Keegan was the lead manager had failed.

On February 27, 2008, Morgan Keegan elected to cap its ARS inventory at $182 to 185 million. After reaching the inventory cap, Morgan Keegan stopped purchasing ARS for its own account. On February 28, 2008, the first Morgan

7

Keegan-managed auction failed. As a result of the 2008 market collapse, Morgan

Keegan's ARS customers could not sell their securities through the auction

process or liquidate their investments.[1] In the end and as of March 20, 2008,

Morgan Keegan's customers were left holding approximately $2.2 billion of ARS,

including approximately $1.1 billion of ARS underwritten by Morgan Keegan.[2]

**C. 2006 SEC Investigation of Morgan Keegan's Intervention in ARS Auctions**

In 2006 (prior to this 2009 action), the SEC investigated the ARS

underwriting and auction procedures of Morgan Keegan and other broker–dealers.

Ultimately, the SEC issued a May 31, 2006 cease-and-desist order against Morgan

Keegan and several other broker–dealers. See In re Bear, Stearns & Co., et al.,

Securities Act Release No. 8684, Exchange Act Release No. 53888, 88 SEC

Docket 259 (May 31, 2006).

The SEC charged each of the broker–dealers, including Morgan Keegan,

with violating § 17(a)(2) of the Securities Act by engaging in improper ARS

auction practices. In settling the SEC's administrative charges, the broker–dealers

---

[1]The auction failures did not affect customers' receipt of interest and principal payments as scheduled. Further, the ARS market did not completely dry up because some investors were willing to sacrifice liquidity for the higher interest payments—the maximum rate—resulting from the auction failures.

[2]The complaint alleges that, as of July 15, 2009, Morgan Keegan customers held about $272 million of illiquid ARS, approximately $50 million of which was underwritten by Morgan Keegan.

consented to the issuance of a cease-and-desist order, censure, and payment of a civil fine.

The May 31, 2006 cease-and-desist order states that the broker–dealers, or at least some of them, committed the following "violative practices": (1) completing "open" or "market" bids, which allowed the broker–dealer to designate some of the bid's parameters and which advantaged the investors submitting open or market bids by displacing other investors' bids; (2) without proper disclosure, intervening in auctions to prevent failed auctions or to set a market rate; (3) prioritizing certain customers' bids to increase the likelihood that those bids would be filled; (4) submitting or revising bids after auction deadlines; (5) improperly allocating ARS to investors who bid at the clearing rate instead of allocating them pro rata, as stated in the disclosure documents; (6) in oversubscribed auctions, not requiring certain customers to purchase the pro rata share of ARS for which they had bid, even though the bids were supposed to be irrevocable, (7) providing certain customers with returns above the auction clearing rate based on "an express or tacit understanding reached prior to or during an auction"; and (8) providing different "price talk" to certain investors, giving those investors an advantage in determining what rate to bid. Id. at 5-6. In a footnote, the SEC specifically noted that it was not prohibiting broker–dealers

9

from bidding for their own accounts if proper disclosures were made.

In the cease-and-desist order, each broker–dealer agreed to provide all of its current ARS customers and the ARS issuers "with a written description of the [broker–dealer's] material auction practices and procedures." Id. at 8. Additionally, each broker–dealer agreed to provide all first-time ARS purchasers with a written description of the broker–dealer's "material auction practices and procedures." Id.

The cease-and-desist order allows a broker–dealer to fulfill this notice requirement as to first-time ARS purchasers "by including a written notification with the trade confirmation, that a written description of the [broker–dealer's] material auction practices and procedures is available on a specified web page of the [broker–dealer's] website accessible" to those first-time purchasers. Id. (emphasis added). This written notification with the trade confirmation (1) "must be set forth prominently in such a manner as to call it to the attention of the reader" and (2) must state that a written description of the broker–dealer's "material auction practices and procedures" will be sent to the purchaser upon request. Id.

**D. Trade Confirmations Sent to ARS Purchasers**

Each Morgan Keegan customer who purchased ARS received a trade

10

confirmation after purchasing ARS. The trade confirmations primarily provide information about each transaction, including the security purchased, the price, the trade date, and the issuance and maturity dates of the security.

Morgan Keegan's trade confirmations state, "For information regarding the auction procedures refer to the Morgan Keegan website. Copies available upon request." The home page of Morgan Keegan's website is listed in the top right corner as www.morgankeegan.com. Although the trade confirmations refer to "auction procedures," they do not refer to "auction practices and procedures." Importantly for this case, the trade confirmations do not identify a specific web page on Morgan Keegan's website that contains its ARS auction practices and procedures.

Morgan Keegan's trade confirmations also do not refer to liquidity risk. At best, the back side of the trade confirmations contain a generic statement that investments in securities involve "investment risks." Specifically, the back side of each trade confirmation states, "Securities are not deposits or obligations of any bank. . . . Investments in securities involve investment risks, including the loss of principal."[3]

The trade confirmations state that (1) "[i]f this or any transaction is in error

_____

[3]This statement is in the same font size as the rest of the information but is in bold typeface and all capital letters.

11

or not in accordance with your understanding or instructions, please inform our Customer Service Department immediately," and (2) the transaction is "conclusive and binding if not objected to in writing within ten business days."

**E. ARS Web Page**

Although the trade confirmations do not mention liquidity risk, an ARS web page posted on Morgan Keegan's website shows that Morgan Keegan knew how to advise customers about liquidity risk. The ARS web page first describes ARS as "A Great Place for Short-Term Money" and states that many investors find ARS "to be an attractive alternative" to tax-exempt money market funds, commercial paper, certificates of deposit, and U.S. Treasury bills. However, the ARS web page then cautions that "ARS provide (but do not guarantee) liquidity at par through weekly and 35 day auctions."

More significantly, this same ARS web page later on specifically mentions the liquidity risk associated with ARS, and distinguishes between ARS and money-market funds, as follows:

> You should be aware that investing in auction rate securities involves certain considerations that differentiate such securities from money market investment instruments.
>
> • Liquidity Risk—The ability of an investor to dispose of a share of an auction rate security may be largely dependent on the success of the auction.

There is no assurance that any particular auction will be successful, and neither the issuer nor any broker dealer is obligated to take any action to ensure that an auction will be successful. In the absence of successful auctions, there is no assurance that a secondary market for the auction will develop or, if such a market does develop, that shares will trade at or close to par.

The SEC does not contest that the ARS web page, as a whole, adequately describes the liquidity risk of ARS. The SEC complains, however, that Morgan Keegan did not give the ARS information on this web page directly to its customers and did not even direct its customers to this web page or make the ARS web page easily accessible to its customers. The SEC notes that accessing this ARS web page required four separate navigation steps from Morgan Keegan's homepage. And, despite the requirements in the cease-and-desist order, Morgan Keegan's trade confirmations did not provide customers with the URL for the ARS web page where they could find the description of Morgan Keegan's auction practices and procedures.

Although it asserts that its ARS web page was easily accessible, Morgan Keegan has not cited to us any evidence showing the structure of its website or the navigation necessary to find its ARS web page. The only evidence in the record is a five-page printout of an archived version of the web page itself.

**F. ARS Manual**

In addition to this ARS web page, Morgan Keegan relies on its 24-page

13

manual (the "ARS Manual") describing its auction practices and procedures. After the May 31, 2006 cease-and-desist order, Morgan Keegan prepared and sent this ARS Manual to all customers who already held ARS at the time the ARS Manual was prepared.

Like the ARS web page, the ARS Manual shows that Morgan Keegan was aware of, and knew how to disclose, the liquidity risk of ARS. For example, the ARS Manual has the same information quoted above from the shorter ARS web page that discusses the liquidity risk of ARS. The ARS Manual also warns that "[h]olders who have submitted sell orders should be aware that, in the event of an auction failure, they will not be able to sell all, and may not be able to sell any, securities in the auction." A section entitled "Risk Factors and Special Considerations" explains that (1) Morgan Keegan may act as a buyer or seller in auctions, but is not obligated to do so, and (2) the fact that an auction clears successfully does not mean that an ARS investment "involves no significant liquidity or credit risk." Under a section styled "No Assurances Regarding Auction Outcomes," Morgan Keegan warns that it "provides no assurance as to the outcome of any auction. Nor does Morgan Keegan provide any assurance that any bid will be successful, in whole or in part, or that any auction will clear at a rate that a bidder considers acceptable."

Also like the ARS web page, the SEC does not dispute that the ARS Manual adequately advises about liquidity risk. Rather, the SEC stresses that Morgan Keegan did not make the ARS Manual's disclosures readily accessible to new ARS customers in 2008 and did nothing else to ensure its customers saw or even knew about the ARS Manual.

It is undisputed that Morgan Keegan did not require its brokers to distribute copies of the ARS Manual directly to new customers before or after they purchased ARS. And even though the ARS Manual was apparently posted somewhere on Morgan Keegan's website, Morgan Keegan has not cited evidence showing specifically where it was on the website or how a customer would navigate to it.[4]

**G. ARS Brochure and New Disclosure Procedure**

To underscore that Morgan Keegan knew about, and easily could have disclosed, the liquidity risk of ARS (especially during the early 2008 time period),

---

[4]The ARS web page in the record is an archived version of a web page, but the ARS Manual in the record appears to be a hard copy of the Manual. We note that, in the top right side of the ARS web page, there is the term "Auction Rate Securities Practices and Procedures," which is also the full title of the ARS Manual. However, Morgan Keegan's brief has not cited evidence to us showing whether this language is a link or, if so, whether the link retrieves the ARS Manual. In any event, it appears that a customer would have to get to the ARS web page (or the five-page archived version of the web page that is in the record) and then proceed to the ARS Manual. The SEC does not dispute that the ARS Manual was somewhere on Morgan Keegan's website.

15

the SEC also points both to a Morgan Keegan ARS Brochure (published in hard copy) and to the effective disclosure policy Morgan Keegan instituted after March 20, 2008.

The ARS Brochure is a short, tri-fold brochure describing Morgan Keegan's ARS products and their liquidity risk. The ARS Brochure includes many of the same liquidity risk disclosures contained on the ARS web page and in the ARS Manual. For example, the ARS Brochure states that (1) "investing in auction rate securities involves certain risks that differentiate such securities from money market investment instruments," (2) "[t]he ability of an investor to dispose of a share of an auction rate security may be largely dependent on the success of the auction," and (3) "[t]here is no assurance that any particular auction will be successful, and neither the issuer nor any broker dealer is obligated to take any action to ensure that an auction will be successful."

During 2007 and 2008, Morgan Keegan had hard copies of the ARS Brochure available at some of its office branches.[5] Morgan Keegan also emailed

---

[5]Disputing the availability of hard copies of the ARS Brochure, the SEC points out that Morgan Keegan (1) did not post the ARS Brochure on its public website, (2) did not require the ARS Brochure to be distributed to each branch office before March 20, 2008, (3) did not track which branches requested or received hard copies of the ARS Brochure, (4) had no means of identifying or determining whether hard copies were distributed to brokers at each branch office, and (5) had no standard practice or procedure regarding where and how hard copies of the ARS Brochure were displayed, maintained, or disseminated within each branch office.

the ARS Brochure to all of its brokers, but there is no evidence that Morgan

Keegan emailed the brochure to customers purchasing ARS. Instead, Morgan

Keegan provided the brochure to customers <u>only upon request</u>.

Morgan Keegan did institute a new disclosure policy on March 20, 2008,

after the collapse of the ARS market. Under the new policy, Morgan Keegan

required prospective ARS customers to sign this statement: "I understand that

many auction rate securities are currently, or have been recently, failing at auction.

I understand that it may be a considerable period of time before liquidity returns to

this investment and I view this with a longer term horizon."

## H. Morgan Keegan's Alleged Oral Misrepresentations

During the early 2008 auction failures in the ARS market, Morgan Keegan

continued to sell ARS. Between January 2 and March 19, 2008,[6] Morgan Keegan

sold approximately $647 million of ARS to about 1,145 customers. This is the

time frame at issue in this SEC enforcement action.

The SEC contends that, in late 2007 continuing through the collapse of the

ARS market in February 2008, Morgan Keegan's brokers misrepresented ARS

liquidity risk in an attempt to increase sales. The SEC cites the testimony of four

---

[6]The SEC chose to end the time period for this action on March 20, 2008, apparently because that date was when Morgan Keegan instituted its new policy of requiring ARS customers to sign a statement that they understood the liquidity risk of ARS and viewed the ARS investment "with a longer term horizon."

17

customers who stated that Morgan Keegan brokers misled them regarding the risk associated with ARS. These four Morgan Keegan customers testified that Morgan Keegan brokers told them that ARS (1) were "as good as cash"; (2) were "as good as money"; (3) were "just like money markets and CDs"; (4) were "cash equivalents to CDs and money markets"; (5) were "just as good as" an investment in a CD insured by the FDIC; (6) were "completely liquid" except for a "possible 35-day hold"; (7) presented "zero concerns [and] zero risk"; and (8) involved "absolutely no risk."

The customers averred that the brokers did not disclose the possibility of an auction failure and the associated liquidity risk. They testified further that some Morgan Keegan brokers claimed that ARS investments carried no risk at all. The SEC contends that these four customers never saw the ARS web page, the ARS Manual, or the ARS Brochure, and that their brokers never told them where these documents could be found.

The SEC also submitted written complaints from 14 customers, including customer letters, civil actions filed in federal court, arbitration statements of claim filed with the Financial Industry Regulatory Authority, complaints filed with state regulators, and complaints filed with the SEC. These written complaints identified similar misrepresentations of the liquidity risk of ARS by Morgan Keegan brokers.

18

## II. PROCEDURAL HISTORY

On July 21, 2009, the SEC sued Morgan Keegan for securities fraud in violation of § 17(a) of the Securities Act (Counts One and Two); § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Count Three); and § 15(c)(1) of the Exchange Act (Count Four). The complaint alleged that Morgan Keegan's brokers and marketing materials misrepresented ARS as cash alternatives and omitted mention that ARS carried liquidity risk.[7]

The SEC's complaint sought this relief: (1) findings that Morgan Keegan committed the violations alleged in the complaint, (2) a permanent injunction prohibiting Morgan Keegan from violating Rule 10b-5, §§ 10(b) and 15(c)(1) of the Exchange Act, and § 17(a) of the Securities Act, (3) an order requiring Morgan Keegan "to repurchase all ARS that the Defendant sold prior to March 20, 2008," (4) disgorgement of "all ill-gotten gains or unjust enrichment," and (5) civil monetary penalties in accord with § 20(d) of the Securities Act and § 21(d)(3) of the Exchange Act.

Following discovery, Morgan Keegan moved for summary judgment on all counts on the ground that the undisputed facts failed to show a "material"

---

[7]The complaint also alleged that Morgan Keegan's brokers were insufficiently trained on the liquidity risk of ARS and that Morgan Keegan continued to push ARS despite knowledge of significant and increasing risk associated with ARS. These claims are not on appeal.

misrepresentation or omission, as required for liability under the Exchange Act, the Securities Act, and Rule 10b-5. In a thorough order, the district court granted Morgan Keegan's motion. SEC v. Morgan Keegan & Co., 806 F. Supp. 2d 1253 (N.D. Ga. 2011). The district court first analyzed Morgan Keegan's distribution of its written disclosures about liquidity risk and concluded they were adequately distributed. Id. at 1260-62. As to the materiality issue, the district court noted that oral misrepresentations are not immaterial simply because proper written disclosures exist but then concluded that "the oral statements of four brokers out of hundreds would not lead a rational jury to believe that Morgan Keegan, as a whole, misrepresented the risks of ARS investments to its customers."[8] Id. at 1265.

The district court observed that the Supreme Court's standard for materiality—whether a reasonable investor would view certain information as significantly altering the "total mix" of information available—works well when (1) a securities dealer makes a misrepresentation to an individual who brings a private action against the dealer, or (2) when a dealer makes a misrepresentation to the public, in a press release for example, and the SEC brings an enforcement

---

[8]Although the SEC submitted written complaints by 14 other customers, the district court declined to consider this evidence on the ground that the statements were inadmissible hearsay. Morgan Keegan, 806 F. Supp. 2d at 1265 n.12.

action on behalf of the public.  Id. at 1266.  The district court characterized this case as a "hybrid case where the SEC claims that Morgan Keegan misled the public through the oral statements made to four individuals."  Id.  In granting summary judgment to Morgan Keegan, the district court concluded that the SEC "must do more than show a few isolated instances of alleged broker misconduct to obtain the relief it seeks."  Id.

The SEC appeals.[9]

## III. DISCUSSION

The SEC alleges that Morgan Keegan violated §§ 10(b) and 15(c)(1) of the Exchange Act, § 17(a) of the Securities Act, and SEC Rule 10b-5.  To prove a violation of § 10(b) or Rule 10b-5,[10] the SEC must show (1) a material misrepresentation or materially misleading omission, (2) in connection with the purchase or sale of a security, (3) made with scienter.  SEC v. Merch. Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007).  The elements of a § 15(c)(1) claim are the same as a § 10(b) claim.[11]  SEC v. George, 426 F.3d 786, 792 (6th Cir. 2005).

---

[9]"We review the entry of summary judgment de novo . . . ."  SEC v. Warren, 534 F.3d 1368, 1369 (11th Cir. 2008).

[10]Section 10(b) of the Exchange Act is codified at 15 U.S.C. § 78j(b).  Rule 10b-5 is codified at 17 C.F.R. § 240.10b-5.

[11]Section 15(c) of the Exchange Act is codified at 15 U.S.C. § 78o(c).

21

To show a violation of § 17(a)(1), the SEC must prove (1) a material misrepresentation or materially misleading omission, (2) in the offer or sale of a security, (3) made with scienter. Merch. Capital, 483 F.3d at 766. Finally, to establish a violation of § 17(a)(2) or 17(a)(3),[12] the SEC must show (1) a material misrepresentation or materially misleading omission, (2) in the offer or sale of a security, (3) made with negligence. Id.

An important distinction exists between the elements of a private enforcement action and an SEC enforcement action. In a private enforcement action under § 10(b) or Rule 10b-5, the plaintiff also must show "justifiable reliance" on the material misstatement or omission and that the misstatement caused the plaintiff's damages. See Bruschi v. Brown, 876 F.2d 1526, 1529 (11th Cir. 1989). "Justifiable reliance," however, is not an element of an SEC enforcement action because Congress designated the SEC as the primary enforcer of the securities laws, and a private plaintiff's "reliance" does not bear on the determination of whether the securities laws were violated, only whether that private plaintiff may recover damages. See SEC v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir. 1993) ("The SEC need not prove reliance in its action for injunctive relief on the basis of violations of section 10(b) and Rule 10b–5."); SEC

---

[12]Section 17(a) of the Securities Act is codified at 15 U.S.C. § 77q(a).

22

v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985) ("Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money."); see also Merch. Capital, 483 F.3d at 766 (not including "reliance" in the elements of a § 10(b) action in an SEC enforcement action).

In its summary-judgment motion, Morgan Keegan challenged only the SEC's failure to meet the "materiality" element of each of its claims. Accordingly, the district court assumed that the SEC had met the other elements, namely that Morgan Keegan's brokers made oral misrepresentations or omissions "in connection with" the purchase or sale of securities, and that these misrepresentations or omissions were made with scienter or negligence, as appropriate. Morgan Keegan, 806 F. Supp. 2d at 1259–60. Because both the district court and the parties on appeal addressed only "materiality," we do the same.

## A. The Test for Materiality

The U.S. Supreme Court has developed the materiality test in a series of private actions in which the plaintiff investors alleged that the defendant company's public statements were misleading. See Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011); Basic Inc. v. Levinson, 485 U.S. 224, 108 S.

Ct. 978 (1988); <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 96 S. Ct. 2126 (1976). The parties agree that this materiality test also applies in this SEC enforcement action.

The modern test for determining materiality derives from the Supreme Court's 1976 decision in <u>TSC Industries v. Northway, Inc.</u>, which involved a minority shareholder's allegation that the defendant companies' joint proxy statement was materially misleading, in violation of § 14(a) of the Exchange Act. 426 U.S. at 441, 96 S. Ct. at 2129. The Supreme Court noted the "universal[]" agree[ment]" that materiality is an "objective" inquiry involving the significance of an omitted or misrepresented fact to a reasonable investor. <u>Id.</u> at 445, 96 S. Ct. at 2130. In <u>TSC Industries</u>, the Supreme Court adopted this standard for materiality in a proxy solicitation: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." <u>Id.</u> at 449, 96 S. Ct. at 2132. In other words, a misstatement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Id.</u>; <u>see also</u> <u>SEC v. Ginsburg</u>, 362 F.3d 1292, 1302 (11th Cir. 2004) ("Materiality is proved by showing a substantial likelihood that the disclosure of the omitted fact

24

would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (quotation marks omitted)); Merch. Capital, 483 F.3d at 766 (applying "reasonable man" standard).

In its next major materiality decision, Basic Inc. v. Levinson in 1988, the Supreme Court expressly applied the TSC Industries materiality test to a fraud case under § 10(b) of the Exchange Act and Rule 10b-5.  485 U.S. at 231–32, 108 S. Ct. at 983 (stating that "to fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (quotation marks omitted)).  The plaintiffs in Basic were former shareholders who sold their shares after the defendant company issued public statements denying preliminary merger negotiations, even though the defendant was in merger negotiations with a larger company.  Id. at 227–28, 108 S. Ct. at 981.  The defendant company in Basic proposed a bright-line rule for determining the materiality of merger negotiations—"merger discussions do not become material until 'agreement-in-principle' as to the price and structure of the transaction has been reached between the would-be merger partners."  Id. at 233, 108 S. Ct. at 984.

In Basic, the Supreme Court acknowledged that considering merger

negotiations "material" only after an agreement in principle was reached would be an easy materiality test to apply. Id. at 236, 108 S. Ct. at 986. However, "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive." Id. (emphasis added). Noting that the materiality test "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him," the Supreme Court rejected the "agreement-in-principle" test as underinclusive. Id.; see also Ginsburg, 362 F.3d at 1302 (noting that materiality "requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts" and that "these assessments are peculiarly ones for the trier of fact" (quoting TSC Indus., 426 U.S. at 450, 96 S. Ct. at 2133)). The Supreme Court found "no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure has not yet been reached by the parties or their representatives." Basic, 485 U.S. at 236, 108 S. Ct. at 986 (emphasis added).

Rather, Basic concluded that "materiality depends on the significance the

26

reasonable investor would place on the withheld or misrepresented information." Id. at 240, 108 S. Ct. at 988. The role of the materiality inquiry is "to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." Id. at 234, 108 S. Ct. at 985 (emphasis added). Thus, "[w]hether merger discussions in any particular case are material . . . depends on the facts." Id. at 239, 108 S. Ct. at 987.

The Supreme Court's recent application of the materiality test in Matrixx Initiatives, Inc. v. Siracusano is also instructive as to what number of adverse events it takes to make certain information "significant" to the reasonable investor. 131 S. Ct. 1309 (2011). There the plaintiff investors sued Matrixx, a pharmaceutical company, for failing to disclose reports of adverse events caused by Matrixx's Zicam cold-remedy product, in violation of § 10(b) of the Exchange Act and Rule 10b-5. The plaintiffs alleged that Matrixx knew of reports from several doctors that their patients lost their senses of smell after using Zicam.[13]

_____

[13]Although Matrixx was aware of these doctors' reports, Matrixx relied on its own clinical trials and issued a press release stating that (1) Zicam products were manufactured and marketed in compliance with FDA guidelines, (2) "Matrixx believes statements alleging that intranasal Zicam products caused anosmia (loss of smell) are completely unfounded and misleading," and (3) in two double-blind, placebo-controlled, randomized clinical trials, there were no reports of anosmia and "no statistically significant difference between the adverse event rates for the treated and placebo subsets." Matrixx, 131 S. Ct. at 1316.

Yet, Matrixx issued positive earnings expectations and failed to disclose that it already was defending product-liability lawsuits involving Zicam.[14]

Matrixx's defense was that the plaintiff investors failed to allege a "statistically significant correlation between the use of Zicam and [loss of smell] so as to make failure to publicly disclose complaints and [the doctors' reports] a material omission." Id. at 1317. Rejecting this argument, the Supreme Court noted that—like the defendant company in Basic—Matrixx was proposing a "bright-line rule that reports of adverse events associated with a pharmaceutical company's products cannot be material absent a sufficient number of such reports to establish a statistically significant risk that the product is in fact causing the events." Id. at 1318–19 (footnote omitted). But this proposed rule would "artificially exclude information that would otherwise be considered significant to the trading decision of a reasonable investor." Id. at 1319 (alteration and quotation marks omitted). The Supreme Court reasoned that statistically significant data are not always available and that medical researchers and the FDA routinely rely on other

_____

[14]In October 2003, Matrixx reported that Zicam was "poised for growth in the upcoming cough and cold season" and predicted a 50% revenue increase and earnings per share of between 25 to 30 cents. Matrixx, 131 S. Ct. at 1315. In its 10-Q filed with the SEC in November 2003, Matrixx warned that product-liability claims, "whether or not proven to be valid," could have a "material adverse effect" on its product branding and goodwill. Id. Matrixx did not disclose that two plaintiffs had sued, alleging Zicam caused their loss of smell. Then, in January 2004, Matrixx raised its revenue growth prediction to 80% and its earnings-per-share estimate to 33 to 38 cents. Id.

evidence to establish an inference of causation. "Given that medical professionals and regulators act on the basis of evidence of causation that is not statistically significant, it stands to reason that in certain cases reasonable investors would as well." Id. at 1321.[15]

## B. The "Total Mix" of Information in an SEC Enforcement Action

We now apply this materiality test to the facts of this SEC enforcement action. To do so, however, we must answer the threshold question of whether, in an SEC enforcement action, a misstatement or omission by an individual broker to an individual investor may be included in the analysis of the "total mix" of information available to the hypothetical reasonable investor. For several reasons, we conclude that the brokers' alleged misstatements are included in the materiality inquiry in an SEC enforcement action.

Morgan Keegan's principal argument on appeal is that an SEC enforcement action is designed to protect the public as a whole, and therefore the SEC must

---

[15]Applying the Basic "total mix" standard, the Supreme Court in Matrixx concluded that, at the motion to dismiss stage, materiality was established under these facts alleged in the complaint: (1) Matrixx received information from medical experts revealing a plausible connection between Zicam and the loss of smell, (2) consumers would likely have viewed the risk of losing the sense of smell as outweighing the benefit of using Zicam to alleviate cold symptoms, and (3) Zicam accounted for 70% of Matrixx's sales. The Supreme Court concluded that these facts suggested "a significant risk to the commercial viability of Matrixx's leading product" and that a reasonable investor would view information about this risk to the company's leading product as "significantly alter[ing] the total mix of information made available." Matrixx, 131 S. Ct. at 1323 (quotation marks omitted).

demonstrate that Morgan Keegan misled the public as a whole and not just a small subset of customers. Morgan Keegan argues that the "materiality" of a misrepresentation in an SEC enforcement action is evaluated in the context of only disclosures to the public as a whole and without any consideration of a broker's communications to a particular investor.[16] This argument fails because the Supreme Court's materiality standard analyzes the "total mix" of information available to a hypothetical reasonable investor, not just to the public at large. See Matrixx, 131 S. Ct. at 1318 (stating the test for materiality is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (emphasis added) (quotations marks omitted)); see

_____

[16]Citing Dupuy v. Dupuy, 551 F.2d 1005, 1015 (5th Cir. 1977), Morgan Keegan argues that "materiality in SEC enforcement actions is appropriately evaluated in the context of disclosures made 'to the public, not to any particular investor.'" Morgan Keegan cites Dupuy wholly out of context. First, the issue in Dupuy was whether the private plaintiff acted with due diligence, not whether the defendant's misrepresentations and omissions were material. Second, Dupuy does not purport to limit SEC enforcement actions in any way. Rather, the Court was explaining that the subjective knowledge or diligence of any particular investor is not relevant to an SEC enforcement action, which focuses on whether a defendant violated the securities laws, not whether any particular investor was harmed.

If anything, Dupuy bolsters our conclusion that the brokers' statements must be included in the materiality inquiry by stating that the "standard of conduct for defendants logically should be the same whether the SEC or a private litigant enforces the duty" imposed by the securities laws. Id. Because the materiality test determines whether a defendant's conduct violates the securities laws, the materiality test "logically should be the same whether the SEC or a private litigant enforces the duty." See id. The materiality test will be the same only if the "total mix" of information is the same in an SEC enforcement action as it is in a private enforcement action.

also <u>Basic</u>, 485 U.S. at 236, 108 S. Ct. at 986 (stating the materiality analysis "requires delicate assessments of the inferences a '<u>reasonable shareholder</u>' would draw from a given set of facts and the significance of those inferences to <u>him</u>" (emphasis added)); <u>Merch. Capital</u>, 483 F.3d at 768–71 (applying "reasonable man" standard). In other words, the materiality test requires the court to consider <u>all</u> the information available to the hypothetical reasonable investor, which necessarily includes private communications. <u>See</u> <u>Aaron v. SEC</u>, 446 U.S. 680, 682–83, 100 S. Ct. 1945, 1948–49 (1980) (considering, in SEC enforcement action against managerial employee of broker–dealer, misleading statements by two individual brokers to prospective investors). By failing to consider the brokers' alleged oral misrepresentations, Morgan Keegan's analysis deprives the publicly available written disclosures of their complete context and deprives its brokers' oral misrepresentations of any role in SEC enforcement actions.

The problem for Morgan Keegan is the SEC enjoys the authority to seek relief for <u>any</u> violation of the securities laws, no matter how small or inconsequential.[17] And it is well-settled that a violation of § 10(b) of the

---

[17]Both the Securities Act and the Exchange Act permit the SEC to bring a civil action either to enjoin or to impose a civil penalty for any violation of the federal securities laws. <u>See</u> 15 U.S.C. § 77t(b) ("Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the [Securities Act], or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States . . . to enjoin such

Exchange Act requires only a (1) material misrepresentation or materially misleading omission, (2) in connection with the purchase or sale of securities, (3) made with scienter. Merch. Capital, 483 F.3d at 766. The SEC thus may seek a civil penalty against any defendant who has made a single misstatement or omission, if material and made with scienter and in connection with the purchase or sale of securities.[18] Morgan Keegan cannot show that its oral misstatements were immaterial merely by showing that those statements were not made publicly.

Moreover, a rule excluding all individual broker–investor communications from the materiality inquiry is underinclusive, just like the "agreement-in-principle" rule the Supreme Court rejected in Basic and the "statistical significance" rule it rejected in Matrixx. See Basic, 485 U.S. at 236, 108 S. Ct. at 986; Matrixx, 131 S. Ct. at 1319. That is, the hypothetical reasonable investor looking for a short-term, liquid investment is likely to consider his broker's statements about the relative merit (and lack of risk) of certain investments in

_____

acts or practices . . . ."); 15 U.S.C. § 78u(d)(1) ("Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of [the Exchange Act], the rules or regulations thereunder, [or] the rules of a national securities exchange or registered securities association of which such person is a member or a person associated with a member . . . it may in its discretion bring an action in the proper district court of the United States . . . to enjoin such acts or practices . . . ."); see also 15 U.S.C. §§ 77t(d), 78u(d)(3) (authorizing the SEC to seek a monetary civil penalty against any person who "has violated any provision" of the Securities Act or the Exchange Act).

[18]Other limitations—such as money or time—may counsel against the SEC's prosecuting such actions. But the statutes grant the SEC this broad authority.

32

deciding among different investment options.[19]  And the fact-finder could easily conclude that a reasonable investor would find liquidity risk an important factor in determining whether to invest in ARS, especially given Morgan Keegan's advertising ARS as a highly liquid alternative to money market funds.

Further, there is no statutory or precedential support for Morgan Keegan's argument that some threshold number of investors must be misled before finding its brokers' misrepresentations "material" in an SEC enforcement action.  The SEC is not required to prove an institution-wide effort by brokers to mislead customers in order to bring or to prevail in an SEC enforcement action.  The extent of the brokers' misrepresentations may ultimately affect the size of the remedy, such as fines or disgorgement imposed, but there is no minimum number of misrepresentations required for a materiality finding in an SEC enforcement action.  Simply put, a numerical threshold for materiality runs counter to the securities acts' broad grant of authority to the SEC to bring an action for any violation of the securities laws.

In this case, the SEC presented evidence that four Morgan Keegan brokers

---

[19]Because this is an SEC enforcement action, we need not determine whether the individual investor's reliance on his broker's statements is reasonable.

misrepresented the liquidity risk of ARS to customers.[20]  Under principles of

respondeat superior, Morgan Keegan is liable for the acts of these brokers so long

as they acted within the scope of their authority.  See Paul F. Newton & Co. v.

Tex. Commerce Bank, 630 F.2d 1111, 1118 (5th Cir. 1980) (concluding that

"common law agency principles, including the doctrine of respondeat superior,

remain viable in actions" under the Exchange Act).[21]  Morgan Keegan concedes

that these four brokers were acting within the scope of their authority when they

made the alleged misrepresentations.  Thus, the SEC, at a minimum, may establish

a securities violation with respect to each of those four investors irrespective of

"an institutional effort to mislead" customers and irrespective of whether any

additional brokers attempted to mislead Morgan Keegan's other customers.  In this

SEC enforcement action, we discern no reason to exclude Morgan Keegan's

brokers' misrepresentations from the materiality analysis of the "total mix" of

---

[20]The SEC argues that the district court abused its discretion by refusing to consider the SEC's evidence of other alleged misrepresentations, including written complaints by 14 other customers that their Morgan Keegan brokers had misrepresented the liquidity risk of ARS. Because we conclude that the SEC met its burden to show "materiality" with respect to the misstatements to the four investors, we need not address whether the district court erred in excluding this evidence as hearsay during the summary judgment stage.  We recognize that the SEC argues that the district court may consider hearsay when ruling on summary judgment if the statement could be reduced to admissible evidence at trial.  The SEC will have an opportunity to do just that as to these 14 customers on remand during the trial.

[21]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

information available to the reasonable investor.

**C. The Materiality of Oral Misrepresentations Conflicting With Morgan Keegan's Written Disclosures Is an Issue for the Trier of Fact**

Having decided that these alleged oral misrepresentations by the four Morgan Keegan brokers must be considered for purposes of materiality, we next determine whether Morgan Keegan's written disclosures nonetheless rendered its brokers' oral misrepresentations immaterial as a matter of law. The way information is disclosed can be as important as its content. Thus, in evaluating the effect of Morgan Keegan's written disclosures, we must consider not only the content of the written disclosures but also the way in which the disclosures were made. After record review, we conclude that, even if a brokerage company's written disclosures might render its individual brokers' oral misstatements immaterial in some cases, Morgan Keegan's manner of distribution of its written disclosures in this particular case was insufficient to warrant summary judgment for Morgan Keegan.

In this regard, the main securities cases the parties cite from our circuit addressing the interplay of written disclosures and oral misrepresentations are Bruschi v. Brown, 876 F.2d 1526 (11th Cir. 1989), and First Union Discount Brokerage Servs., Inc. v. Milos, 997 F.2d 835 (11th Cir. 1993). Because these two cases involve justifiable reliance rather than materiality, they are not on point. Yet

35

these cases show that the effect of oral misrepresentations conflicting with written disclosures—whether measured by a private plaintiff's reliance or by the significance to a hypothetical reasonable investor—depends heavily on the facts of each case.

In Bruschi, the defendant–broker gave the written disclosures directly to the plaintiff–investor, but we concluded they did not warrant judgment as a matter of law for the defendant in the plaintiff's private action alleging oral misrepresentations. The Bruschi plaintiff, an unsophisticated investor, hired the defendant Brown as her broker and investment advisor. Id. at 1527. Employed at Dean Witter Reynolds, Inc., defendant Brown recommended "the Elmco investment," which he described in positive terms, and stated it would provide the plaintiff with "significant tax deductions." Id. Brown did not disclose that the Elmco investment was a complex and risky venture involving unregistered securities and was neither endorsed nor offered by Dean Witter, or that Elmco was paying Brown a commission for any securities he sold. Brown visited the plaintiff's home to close the transaction and gave her 160 pages of documents describing the merits and risks of the Elmco investment. Id. at 1527–28. After Brown assured that her signature "was a mere formality," the plaintiff signed the documents without reading them. Id. at 1528.

Defendant Brown argued that the extensive disclosure documents conflicted with the alleged oral misrepresentations and that, as a matter of law, "an investor is not justified in relying on oral misrepresentations that conflict with contemporaneous written representations." Id. at 1529. This Court noted that it had never held that, "regardless of the circumstances, an investor is always precluded from recovering under Rule 10b-5 if the misrepresentations upon which the investor relied were oral and conflict in some way with contemporaneous written representations available to the investor." Id.[22]

In Bruschi, this Court then listed several factors for determining whether an investor's reliance is justified.[23] This Court concluded that, "[w]hen all factors are considered, it cannot be held as a matter of law that [plaintiff] Bruschi's reliance on the alleged oral misrepresentations was not justified." Id. at 1530. Even in

---

[22]In Bruschi, although the oral "misrepresentations conflicted with statements in the disclosure documents that the economic and tax risks were substantial," the Court also noted that "[t]he disclosure documents . . . were consistent with Brown's alleged oral misrepresentations that (1) there were no material relationships between himself and Elmco and (2) that he had not and would not be receiving any compensation from Elmco." Bruschi, 876 F.2d at 1530. "Thus, even if Bruschi had read the disclosure documents, she would have received conflicting signals as to the reliability of the alleged oral misrepresentations rather than the obvious indication of unreliability argued by Brown."

[23]The Bruschi court listed these factors: "(1) the sophistication and expertise of the plaintiff in financial and security matters; (2) the existence of long standing business or personal relationships between the plaintiff and the defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by the defendant to the plaintiff, (5) concealment of fraud by the defendant; (6) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations." Bruschi v. Brown, 876 F.2d 1526, 1529 (11th Cir. 1989).

37

Bruschi, where the plaintiff bore the additional burden to show justifiable reliance, this Court did not allow the written disclosures to trump oral misrepresentations as a matter of law.[24]

Subsequently, in First Union v. Milos, this Court distinguished Bruschi in holding that sophisticated investors could not have justifiably relied on a broker's oral representations that "predated and conflicted with the clear language" of two contracts directly given to and signed by the investors. 997 F.2d at 846. The First Union Court stated that "[i]n Bruschi, we explained that circumstances may warrant departure from the usual presumption that reliance on an oral representation that a written representation contradicts is not justified." Id. at 846 n.22. This Court compared the factual circumstances in Bruschi and First Union and concluded that the facts did not warrant departure in First Union: Factually,

---

[24]Morgan Keegan also relies on Acme Propane, Inc. v. Tenexco, Inc., 844 F.2d 1317 (7th Cir. 1988), but that private action involved written disclosures that were given directly to the plaintiff investors. Acme Propane does include a curious footnote stating that, although the precedent it cited was interpreting the reliance element of a securities fraud claim, "'reliance' in securities law is just a code word for causation, which in turn usually means a material misstatement." Id. at 1322 n.*. However, this is an SEC enforcement action, which requires no showing of justifiable reliance.

Moreover, the Supreme Court's cases establish an objective, reasonable-investor standard for determining "materiality." Reliance, in contrast, focuses on the individual investor–plaintiff. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 159, 128 S. Ct. 761, 769 (2008) (stating the reliance element of a private action under Rule 10b-5 "ensures that . . . the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury exists as a predicate for liability" (quotation marks omitted)). To the extent the Acme Propane footnote says that justifiable reliance and materiality are the same inquiry, we find Acme Propane unpersuasive and rely instead on the Supreme Court's materiality cases outlined above.

Bruschi involved (1) "an offering memorandum"; (2) an investor who was "unsophisticated and inexperienced in financial matters" and told not to read the disclosure documents; (3) a security purchase "initiated" by the defendant–broker; and (4) "some statements in the disclosure documents [that] confirmed some of the alleged oral misrepresentations." Id. (quotation marks omitted). By comparison, in First Union: (1) the disclosures were in "two written contracts" given directly to a "sophisticated investor"; (2) the investors "had full control over their investments"; (3) "the written agreements violently contradicted the oral representations"; and (4) First Union did not tell the investors not to read the written agreements. Id.

While Bruschi and First Union involve "justifiable reliance," they nonetheless show that, in securities cases, whether written disclosures should trump oral misrepresentations is highly fact-specific and therefore is not amenable to bright-line rules. Cf. Matrixx, 131 S. Ct. at 1318–19; Basic, 485 U.S. at 236, 108 S. Ct. at 986; TSC Indus., 426 U.S. at 450, 96 S. Ct. at 2133.

Here, after considering the entire record, we conclude that Morgan Keegan's written disclosures do not warrant summary judgment for Morgan Keegan on the "materiality" issue. The oral misrepresentations at issue here were made directly to customer–investors who aver they never received or knew about

the written disclosures at the time of their purchases. Importantly too, the oral misstatements must be considered in the factual context of a weak, or non-existent, distribution of the written disclosures.

For example, although Morgan Keegan produced adequate written disclosures in the ARS Manual and the ARS Brochure and gave the ARS Manual directly to customers in 2006, there is no evidence that, during late 2007 and early 2008, Morgan Keegan directly gave customers these written disclosures before or after customers purchased ARS. At most, the record shows that the ARS Brochure was available at some of Morgan Keegan's branch offices, but the ARS Brochure was given to customers only upon a customer's request.

The only written documents that were directly given to ARS purchasers were the trade confirmations. But the trade confirmations say absolutely nothing about liquidity risk.

The trade confirmations do refer customers to the website for "information regarding the auction procedures," but the trade confirmations list only the Morgan Keegan home page (despite the cease-and-desist order's explicit instruction[25] that the trade confirmations notify customers that a written

---

[25]At oral argument, Morgan Keegan argued that the SEC should be estopped from arguing that Morgan Keegan had not met its disclosure requirements because the cease-and-desist order explicitly states that a broker–dealer could meet its disclosure obligations under the cease-and-desist order by including a note in the confirmation that the broker–dealer's "material auction

description of Morgan Keegan's auction practices "is available on <u>a specified</u>

<u>webpage</u> of [Morgan Keegan's] website"). While the evidence contains a copy of

an archived ARS web page on Morgan Keegan's website, there is no evidence that

brokers directed customers interested in ARS to the ARS web page.[26]

We recognize that the back of the trade confirmations state that securities

"involve investment risks, including the loss of principal." But given Morgan

Keegan's knowledge of the increasing rate of auction failures in late 2007 and

early 2008, this general cautionary language is insufficient to render its brokers'

oral misrepresentations during that period immaterial as a matter of law. <u>See</u>

<u>Merch. Capital</u>, 483 F.3d at 768 (holding that a defendant's performance

projections were materially misleading despite general cautionary language

because the defendant failed to disclose past performance information "that would

practices and procedures" is available on a specified web page on the broker–dealer's website. We are not persuaded. The cease-and-desist order deals with the distinct violation of failing to disclose auction practices and procedures, not with misrepresenting or failing to disclose the liquidity risk of ARS. In other words, the fact that a broker–dealer has adequately disclosed its ARS auction procedures does not absolve the broker–dealer of liability for its brokers' materially misleading statements about the liquidity risk of ARS.

[26]At this summary judgment stage, we need not resolve the dispute over how many steps a customer would need to reach the ARS web page because Morgan Keegan has not presented evidence that anyone ever visited the ARS web page or that any of its brokers ever directed a customer to its ARS web page. At oral argument, Morgan Keegan's attorney mentioned that a customer could enter "auction" in the search box on its homepage and thereby reach the ARS web page. We cannot find that in the record either. In any event, Morgan Keegan's manner of distributing its written disclosures of ARS liquidity risk in 2008 does not warrant summary judgment for Morgan Keegan.

be useful to a reasonable investor in assessing those [optimistic performance projections]").

Moreover, the trade confirmations were provided only after the ARS purchase and after the alleged oral misrepresentations. And because nothing in the trade confirmations discloses the liquidity risk of ARS, customers would have no reason to investigate whether to use the ten-day provision to rescind the transaction. Accordingly, the ten-day-rescission remedy is insufficient to support a finding, as a matter of law, that the brokers' oral misstatements were immaterial.

Despite failing to provide its written disclosures directly to customers, Morgan Keegan argues that the written disclosures were available to any "reasonably diligent investor." But due diligence is a distinct and subjective element of a private action under Rule 10b-5, unrelated to the objective materiality test. Thompson v. Smith Barney, Harris Upham & Co., 709 F.2d 1413, 1418 (11th Cir. 1983) ("'[D]ue diligence' [is] a separate element in 10b-5 cases, apart from questions of materiality, reliance, or defendants' duties."). And, because due diligence focuses on whether "the carelessness of a plaintiff should preclude his recovery," it is properly considered only in a private action brought by an investor, not an SEC enforcement action. See id. at 1418 n.7.

In sum, the materiality inquiry in this SEC enforcement action must account

42

for the oral misrepresentations of Morgan Keegan's brokers. Because Morgan Keegan's written disclosures were not given directly to customers but were distributed only in the weak or non-effective manner outlined above, we conclude that the brokers' misleading statements and failure to disclose the known liquidity risk of ARS could have "been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." See Basic, 485 U.S. at 231–32, 108 S. Ct. at 983 (quotation marks omitted). Indeed, as noted above, the materiality test requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." TSC Indus., 426 U.S. at 450, 96 S. Ct. at 2133.

## IV. CONCLUSION

For these reasons, we conclude that the district court erred in granting summary judgment for Morgan Keegan based on the "materiality" element of the securities violations charged in this SEC enforcement action. Our holding is narrow and limited to materiality. We do not address whether the SEC has met any other element of its claims or whether the SEC will ultimately prevail in this

litigation.[27] Accordingly, we vacate the district court's June 28, 2011 order granting summary judgment to Morgan Keegan and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

---

[27]In ruling on materiality, we have no occasion to address the remedies being sought by the SEC. Upon remand, both parties should be given the opportunity to develop and litigate the remedies being sought. If the SEC prevails and shows a securities violation or violations, the fact-finder then can consider the appropriate size and scope of the remedies.