[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12250

_____

D.C. Docket No. 9:17-cv-80500-RLR

KAREN A. CARVELLI,
individually and on behalf of all others similarly situated,

Plaintiff,

UNIVERSITY OF PUERTO RICO RETIREMENT SYSTEM,
Lead Plaintiff,

Plaintiff - Appellant,

RYAN HUSEMAN,

Consolidated Plaintiff,

versus

OCWEN FINANCIAL CORPORATION,
RONALD M. FARIS,
MICHAEL R. BOURQUE, JR.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 15, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

NEWSOM, Circuit Judge:

The University of Puerto Rico Retirement System purchased Ocwen

Financial Corporation common stock at an allegedly inflated price after a series of

statements by Ocwen's officers implied that the company would emerge from a

regulatory mess.  When Ocwen's stock price instead began to fall, the Retirement

System brought a private securities-fraud action under §§ 10(b) and 20(a) of the

Securities Exchange Act of 1934 and the SEC's Rule 10b-5, claiming that it had

detrimentally relied on Ocwen's materially misleading statements and omissions

concerning the likelihood of achieving regulatory compliance.  The district court

dismissed the Retirement System's complaint, finding that it had failed to identify

any material misrepresentations or omissions or otherwise state a claim against

Ocwen for securities fraud.  After conducting our own detailed review of the

challenged statements, we agree.  Even considering the Retirement System's

allegations in the most favorable light, as we must, its complaint falls short of

2

alleging any actionable misrepresentations or omissions under § 10(b) and Rule 10b-5 (and by extension § 20(a)) or any other cognizable securities-law violation.

## I

## A

Ocwen is a financial-services company that focuses primarily on mortgage servicing—in particular, by processing borrower payments, administering loan loss-mitigation operations, and managing foreclosures. Between 2009 and 2012, Ocwen grew from big to bigger, expanding its portfolio from approximately 350,000 loans with an unpaid principal balance of roughly $50 billion to more than 1.2 million loans with a balance north of $200 billion. To manage the considerable amount of information required to administer all those loans, Ocwen used a software called REALServicing. Unfortunately for Ocwen, REALServicing didn't really work—the software, as it turned out, was incapable of properly tracking borrowers' accounts and payments, and it recorded inaccurate information about interest, late fees, escrow accounts, or completed payments for up to 90% of the loans in the system.

According to the Retirement System's complaint—the allegations of which we accept as true for present purposes—these problems resulted from REALServicing's fundamental design flaws. For example, REALServicing required the use of more than 10,000 comment codes and flags, but it had no

3

complete data dictionary defining them, so Ocwen employees had no common understanding of what the codes meant or how they should be utilized. REALServicing also "lacked necessary automation and functionality," and thus required constant manual workarounds, which were prone to human error.  And perhaps most importantly, REALServicing "lacked the system capacity to process the large number of loans acquired by Ocwen, resulting in long periods of system unavailability."

These systemic shortcomings caused Ocwen to fail to timely and accurately apply borrower payments and maintain accurate account statements, to charge unnecessary and unauthorized fees, to impose force-placed insurance on borrowers who already had adequate coverage, and, worst of all, to initiate wrongful foreclosures on numerous loans.  An outside consultant found that REALServicing had limited functionality and that Ocwen's "lack of business process automation had resulted in excessive manual processes," which "posed significant risk in a heightened compliance environment."  These and other similar issues prompted Ocwen's former Head of Servicing to describe REALServicing as "an absolute train wreck" and to lament that "[e]very business unit in the entire organization[] lacked sufficient controls to prevent mistakes and to detect when mistakes occur." Another former Head of Servicing similarly—if less colorfully—worried that

4

Ocwen "could not service loans on REALServicing in compliance with applicable laws."

Those concerns were apparently well-placed; the Consumer Financial Protection Board filed a civil action against Ocwen in 2012 for "violating consumer financial laws at every stage of the mortgage servicing process." Other federal and state entities followed suit. Ocwen signed a consent order with 49 state attorneys general in 2013 that "required Ocwen to provide over $2 billion in relief to wronged homeowners and subject itself to a monitor . . . and a monitoring committee"; a consent order with the New York Department of Financial Services in 2014 that required Ocwen to adopt a "system of robust internal controls and oversight" and pay $150 million in fines and restitution; and a consent order with the California Department of Business Oversight in 2015 that required Ocwen to pay a $2.5 million fine and stop acquiring new mortgage-servicing rights in California until it could satisfactorily comply with the Department's requests for information.

The present suit arises from a series of statements that Ocwen made between 2015 and 2017, the years immediately following the federal and state regulatory actions. During this period, Ocwen stated, among other things, that it had "invested heavily in compliance and risk management," such that its "operations [were] now mature and delivering improved controls and results," and that it

5

"expect[ed] the next round of results from the National Mortgage Settlement monitor to show that [it] ha[d] made progress in improving [its] internal testing and compliance monitoring." Ocwen also asserted that it "believe[d] it ha[d] effective controls in place to ensure compliance with the California Homeowners Bill of Rights and all single point of contact requirements under federal and state laws." In a 2015 earnings call with investors, President and CEO Ron Faris told investors that Ocwen was "committed to correcting any deficiencies, remediating any borrower harm, and improving our compliance management systems and customer service." And although Faris acknowledged that Ocwen would incur an expected $50 million in regulatory monitoring costs for the year, he also assured investors that "over time, as we demonstrate ongoing compliance and as the monitors roll off, we should see these expenses decline."[1]

Despite this optimistic outlook, the financial effects of Ocwen's internal problems began to bubble to the surface in February 2016, when it released its Form 10-K for the 2015 fiscal year. Ocwen reported higher-than-expected monitoring and compliance costs in connection with its settlements and other regulatory and litigation matters. The company explained, in an accompanying

---

[1] These statements—along with those found in the following pages and throughout this opinion—are taken from the Retirement System's 118-page, 293-paragraph complaint. *See* Complaint, *Karen A. Carvelli et al. v. Ocwen Fin. Corp. et al.*, 2018 WL 4941110, No.: 9:17-cv-80500-RLR (S.D. Fla. Apr. 30, 2018). We have carefully reviewed each statement that the Retirement System assails as an actionable misrepresentation; this opinion addresses illustrative examples as necessary to our analysis.

presentation, that it had incurred $170 million in monitoring expenses in 2015 and that it expected elevated legal costs to persist in 2016.  Following this news, the price of Ocwen common stock dropped 58%, falling from an opening price of $5.02 on February 29, 2016, to $2.11 on March 1, 2016.

Ocwen stock continued to plummet over the next few months, even while company officials continued to maintain that the company's difficulties were not insurmountable.  In July 2016, Ocwen's Second Quarter Form 10-Q reported that "[w]e are . . . intensely focused on improving our operations to enhance borrower experiences and improve efficiencies, both of which we believe will drive stronger financial performance through lower overall costs."  The 10-Q further stated that "[w]e believe[] [our] significant investments in servicing operations [and] risk and compliance infrastructure over recent years will position us favorably relative to our peers."  And in a conference call that same month, Faris said that "[a]s a Company we continue to make progress in resolving our legacy issues" and that "this legal spend is now largely behind us."  He also stated that Ocwen "remain[ed] focused on compliance, risk management, and service excellence" and was "striving to regain approvals to be able to acquire [mortgage-servicing rights] again" and to "resolve [its] remaining legacy, regulatory, and legal concerns."  On news that Ocwen was working toward a settlement with its monitor from the

California Department of Business Oversight, Ocwen common stock rose 7.1% to close at $1.81 on July 28, 2016.

Over the next few months, Ocwen officials continued to express optimism about the prospect of overcoming regulatory hurdles, and Ocwen's stock prices continued to climb. In an October 2016 press release, Ocwen's board of directors stated that the company "remain[ed] focused on putting legacy matters behind us" and "continue[d] to progress towards a potential resolution with the California Department of Business Oversight to end the current consent order and associated third party auditor before year-end." On October 27, 2016, Ocwen's share price rose 10.8% to close at $4.12.

But alas, trouble soon resurfaced. In February 2017, Ocwen spin-off Altisource revealed that the CFPB was weighing a potential enforcement action against it based on a violation of federal law that arose from REALServicing. And around the same time, Ocwen admitted in its Form 10-K for the period ending December 31, 2016, that it had spent $12.5 million in connection with investigations.

A new wave of regulatory actions followed. In April 2017, a multi-state mortgage committee representing more than 20 states and the North Carolina Office of the Commissioner of Banks issued a cease-and-desist order that prohibited Ocwen from acquiring new mortgage-servicing rights until the company

8

proved that it could effectively manage its mortgage-escrow accounts.  The CFPB also got involved again, filing an action in the United States District Court for the Southern District of Florida alleging that Ocwen had violated its earlier settlement with the CFPB and the state attorneys general.  *See* Complaint, *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp., et al*., No. 9:17-cv-80496 (S.D. Fla. Apr. 20, 2017).  The day the CFPB filed its complaint, Ocwen's stock price fell 53.9%, from $5.46 to $2.49.

## B

Based on what they alleged to be Ocwen's unrealistically optimistic statements and its failure to disclose the extent of its software-related problems, the Retirement System and several other investors filed a putative class action in August 2017, asserting claims for securities fraud under § 10(b) of the Securities Exchange Act and Rule 10b-5 as well as violations of § 20(a) of the Act.  The complaint claimed that "[d]espite knowing of [its] system failures and REALServicing's woeful ineffectiveness in servicing loans," Ocwen continued to "tout[] [its] purported compliance with the Regulator Settlements, its supposed commitment to borrowers, and the effectiveness of [its] internal controls over financial reporting, while at the same time failing to disclose that REALServicing was a dysfunctional system incapable of servicing mortgages."  According to the Retirement System, Ocwen made dozens of materially misleading statements and

9

failed to disclose the extent of its problems, all the while knowing that it would be cost-prohibitive to remediate the errors and properly reconcile its accounts.

Ocwen moved to dismiss, arguing that the complaint didn't sufficiently allege any material misrepresentations or omissions under the Securities Exchange Act or Rule 10b-5. The district court agreed, concluding that each complained-of representation was either immaterial puffery or opinion, an exempt forward-looking statement, or a statement that the Retirement System had failed to allege was actually false.[2] In the alternative, the district court concluded that the Retirement System's complaint "improperly trie[d] to re-cast Ocwen's supposed mismanagement and regulatory failures as false statements under 10b-5." The district court also explained that, because the Retirement System had failed to adequately plead a § 10(b) violation, any claims against the individual defendants under § 20(a) necessarily failed as well. The court dismissed the Retirement System's claims with prejudice, and this appeal followed.

## II

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and

---

[2] Because the district court found that the Retirement System had failed to plead any material misrepresentations, it didn't address Ocwen's argument that the Retirement System had failed to adequately plead the element of loss causation.

10

regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). One such rule, Rule 10b–5, makes it unlawful for "any person," in connection with the purchase or sale of a security, "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Although not explicitly laid out in the text, the Supreme Court has implied a private right of action for investors under Rule 10b–5. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318–19 (2007).

To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege the following elements: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection" between the misrepresentation or omission and the loss, commonly called "loss causation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008) (quotations omitted). Here, we are focused primarily on the first element—whether the Retirement System properly alleged that Ocwen is responsible for any material misrepresentations or omissions.

A misrepresentation or omission is material if, "in the light of the facts existing at the time," a "reasonable investor, in the exercise of due care, would

11

have been misled by it." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (citation omitted). In other words, materiality depends on whether a "substantial likelihood" exists that a "reasonable investor" would have viewed a misrepresentation or omission as "significantly alter[ing] the 'total mix' of information made available." *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).[3] When it comes to omissions specifically, the Supreme Court has clarified that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic*, 485 U.S. at 239 n.17. Rather, absent a duty, material information needn't be disclosed unless its omission would render misleading other information that an issuer *has* disclosed. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

The question of materiality is not subject to a bright-line test, *see id*. at 30, but instead depends on the specific circumstances of each case, including the totality of information available to investors, *see id.* at 37–45. The materiality requirement aims to strike a balance between protecting investors and allowing companies to distribute information without perpetual fear of liability—in essence,

---

[3] *TSC Industries* involved a challenge to a proxy statement arising under Rule 14a-9; however, the Supreme Court has clarified that the discussion of materiality in that case is generally applicable in securities litigation. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (adopting the *TSC Industries* standard for Rule 10b-5 actions).

to ensure that not every minor misstatement provides litigation fodder for disgruntled investors.

Before moving on to discuss the particular statements—and omissions—at issue in this case, we should pause briefly to explain the triple-layered pleading standard that a private securities plaintiff like the Retirement System faces.  To survive a motion to dismiss, a securities-fraud claim brought under Rule 10b–5 must satisfy not only the run-of-the-mill federal notice-pleading requirements, *see* Federal Rule of Civil Procedure 8(a)(2), but also the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4.  Failure to meet any of the three standards will result in a complaint's dismissal.  *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake"—which in the securities-fraud context, we've explained, requires a plaintiff to allege specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud.  *FindWhat*, 658 F.3d at

13

1296. The PSLRA—with some overlap—requires a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). It also requires, "with respect to each act or omission alleged," that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A). The required state of mind, we have held, is an "intent to defraud or severe recklessness on the part of the defendant." *FindWhat*, 658 F.3d at 1299 (quoting *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 790 (11th Cir. 2010)). And a "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Although scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute. *FindWhat*, 658 F.3d at 1296.

Turning to the claims at issue in this case, the Retirement System alleges that Ocwen made numerous material misrepresentations and omissions because, at the time the company was touting improvements and painting a rosy picture of its future prospects, it remained out of compliance with regulatory settlements and, more importantly, remained unable to remedy that noncompliance. After careful review, we find that none of Ocwen's statements rises to the level of an actionable misrepresentation of material fact. Some statements are immaterial puffery, some

14

are mere statements of opinion, some fall within the PSLRA's safe-harbor for forward-looking statements, and still others are simply not alleged to be false. Additionally, we find that the Retirement System failed to allege any actionable omissions—nothing that Ocwen failed to disclose rendered already-disclosed information misleading in context. *Matrixx*, 563 U.S. at 44. We will explain, in turn, our conclusions in more detail.

## A

### 1

The district court determined that the majority of Ocwen's statements were nonactionable because they constituted immaterial "puffery." Puffery comprises generalized, vague, nonquantifiable statements of corporate optimism. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1326 (2015) (differentiating between "mere puffery" and "determinate, verifiable statement[s]" about a company's products). The puffery "doctrine" presumes a relatively (but realistically) savvy consumer—the general idea being that some statements are just too boosterish to justify reasonable reliance. In general parlance, "puffing" is "seller's or dealer's talk in praise of the virtues of something offered for sale." Webster's Third New International 1838 (2002). Perhaps closer to home for our purposes, it refers to an "expression of an exaggerated opinion—as opposed to a factual misrepresentation—with the intent to

15

sell a good or service."  Black's Law Dictionary 1428 (10th ed. 2014).  As Judge Learned Hand once put it, "[t]here are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity."  *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918).  Think, for example, Disneyland's claim to be "The Happiest Place on Earth."  Or Avis's boast, "We Just Try Harder."  Or Dunkin Donuts's assertion that "America runs on Dunkin."  Or (for our teenage readers) Sony's statement that its PlayStation 3 "Only Does Everything."  These boasts and others like them are widely regarded as "puff"— big claims with little substance.

While these slogans may be of relatively recent vintage, puffery itself—and in particular its relevance to the law—is nothing new.  The concept "derives from a common-law defense to the tort of deceit or fraudulent misrepresentation."  *Restatement (Second) of Torts* § 542 cmt. e (Am. Law Inst. 1977).  The legal origins of the term "puffery," so far as we can tell, trace back at least as far as a nineteenth-century English case involving a manufacturer's promise to compensate customers if they contracted the flu after properly using its "carbolic smoke ball"—a rubber ball and tube that allowed users to inhale vapors purported to prevent disease.  *See Carlill v. Carbolic Smoke Ball Co.*, [1893] 1 Q,B. 256 (Eng. Wales CA).  After a customer who came down with the flu tried unsuccessfully to collect, she sued the company.  *Id.*  At trial, the manufacturer defended by labeling

16

its statement "mere puff"—sales talk. *Id.* Although the manufacturer lost because

the panel determined that it made a valid offer to contract by placing the promised

compensation in escrow, the panel's opinion also accepted that some

advertisements—"mere puff"— clearly aren't meant to be taken seriously. *See id.*[4]

Back to the present. While this Court has accepted the puffery defense in

the common-law context, we've yet to apply it in a reported securities-fraud case.

*See Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1028–29 (11th Cir.

2003) (characterizing a comment concerning "strong performance" as

nonactionable puffery in a Georgia fraud suit).[5] We see no basis for not doing so,

however, and in fact the defense seems a particularly good fit in the securities

---

[4] It's possible that the roots of the puffery defense date back even farther. According to one scholar:

> A concept that became a basis of the puffery exclusion predates 1534, when a compiler of English law gave the following example about the potential sale of a horse. "If he be tame and have been rydden upon [by the potential buyer], then *caveat emptor* [let the buyer beware]." The strange legal terms "puffer" and "puffery" apparently became associated with commercial activities in the mid- to late-18th Century. A "puffer" was a person secretly hired by a seller to bid up auction prices ("puffing"), thereby creating a deliberate and material deception that was outlawed by statute in many jurisdictions. By the 19th Century, the term "puffery" (sometimes called "sales talk" or "dealer's talk") had transmogrified into a contrary connotation as a legal defense for vindicating salespeople accused of common law fraud and deceit.

Richard J. Leighton, *Materiality and Puffing in Lanham Act False Advertising Cases: The Proofs, Presumptions, and Pretexts*, 94 Trademark Rep. 585, 616–17 (2004) (alteration in original) (footnotes omitted) (citations omitted)). Regardless, suffice it to say that the defense has been around a long time.

[5] In one unpublished securities case, *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, we referred to issuer's statements of "thoughtful," "effective," and "optimal," among other descriptors, as "puffery." 660 F. App'x 850, 857 (11th Cir. 2016).

17

context.   Rule 10b-5 prohibits untrue statements of a *material* fact, with "material" defined to mean something that a reasonable investor would view "as having significantly altered the 'total mix' of information made available." *Morgan Keegan*, 678 F.3d at 1245 (citation omitted).  Excessively vague, generalized, and optimistic comments—the sorts of statements that constitute puffery—aren't those that a "reasonable investor," exercising due care, would view as moving the investment-decision needle—that is, they're not material.

As the Third Circuit has explained, "[t]o say that a statement is mere 'puffing' is, in essence, to say that it is immaterial, either because it is so exaggerated ('You cannot lose.') or so vague ('This bond is marvelous.') that a reasonable investor would not rely on it in considering the 'total mix of [available] information.'" *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200–01 (3d Cir. 1990) (citation and internal quotation marks omitted).  So too the Eighth Circuit: "A statement is not material and is mere puffery, if it is 'so vague and such obvious hyperbole that no reasonable investor would rely upon [it].'" *In re Stratasys, Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (citation and internal quotation marks omitted); *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) ("Mere sales puffery is not actionable under Rule 10b-5.").  Statements that our sister circuits have recently deemed puffery in the securities-fraud context include, for example, proclamations that a company

18

"expect[s] to continue to allocate significant resources" to regulatory compliance, *Singh v. Cigna Corp*., 918 F.3d 57, 64 (2d Cir. 2019), "generalized statements about [a company's] transparency, quality, and responsibility," *Emp's Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018), and a description of company products as being "unmatched" in "reliability, quality and connectivity," *In re Stratasys*, 864 F.3d at 882.

One final point—an asterisk of sorts—before proceeding to consider how Ocwen's statements stack up.  Materiality is itself a mixed question of law and fact—as the Supreme Court recognized in *TSC Industries*, a materiality determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." 426 U.S. at 450.  That a statement smacks of puff is certainly a strong indicator of immateriality.  But—and here's the caveat—it's not necessarily a clincher.  A conclusion that a statement constitutes puffery doesn't absolve the reviewing court of the duty to consider the possibility—however remote—that in context and in light of the "total mix" of available information, a reasonable investor might nonetheless attach importance to the statement.  *Morgan Keegan*, 678 F.3d at

1245.[6]  Accordingly, when considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted).

**2**

So, what of Ocwen's statements promising, among other things, that it continued "to devote substantial resources to . . . regulatory compliance and risk management efforts," that its investments in those areas were "now mature and delivering improved results," that it felt "good about the progress" it had made towards its "national mortgage settlement compliance," and that it had "taken a leading role in helping to stabilize communities most affected by the financial crisis"?  The district court reasoned that these statements—and others like them— weren't the sort that a reasonable investor could possibly regard as significant because "Ocwen never said it was in compliance with regulations but rather made vague statements about its efforts towards compliance."  In short, Ocwen's statements were puffery.

---

[6] The question whether a statement is material is at least conceptually broader than the question whether a statement is puffery because the materiality inquiry includes consideration of the context in which a statement was made and the circumstances in which a reasonable investor would have heard it.  *See Matrixx*, 563 U.S. at 43–44; *TSC Indus.*, 426 U.S. at 449.

20

The Retirement System raises two objections.  First, it contends that Ocwen's statements can't be nonactionable puffery because Ocwen did not "genuinely or reasonably believe them."  Br. of Appellant at 22 (quoting *IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Grp.,* 783 F.3d 383, 392 (2d Cir. 2015)).  This argument fails.  Whether a statement was made in bad faith or without a reasonable basis is irrelevant to the question whether the statement is nonetheless so airy as to be insignificant.  Certainly, such considerations could (and very well may be) relevant to whether the statements were made with the requisite level of scienter or whether the statements are entitled to safe-harbor protection (more on that later)—but what matters for *materiality* purposes is whether a statement is of a type that a reasonable investor would find relevant to investment decision-making.  Put another way, "[t]he anti-fraud provisions of the securities laws are plainly disinterested with immaterial statements, no matter the state of mind of the speaker."  *Edward J. Goodman*, 594 F.3d at 796; *see also* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 109, at 757 (5th ed. 1984) ("The puffing rule amounts to a seller's privilege to lie his head off so long as he says nothing specific, on the theory that no reasonable man would believe him or that no reasonable man would be influenced by such talk.").

Second, and more concretely, the Retirement System argues that the statements deemed puffery by the district court are, in fact, material. In our view, though, the complained-of statements are quintessential puffery. Ocwen's proclamations that it was devoting "substantial resources" to its problems, with "improved results," as well as its boasts that it was taking a "leading role" and making "progress" toward compliance are precisely the sorts of statements that our sister circuits have—we think correctly—deemed puffery and found immaterial as a matter of law. *See, e.g.*, *Singh*, 918 F.3d at 64; *Whole Foods Mkt.*, 905 F.3d at 902.

The Retirement System nonetheless insists that these statements *become* materially misleading when considered in context—because nothing had changed with REALServicing, it argues, promises about improvements and progress were false, and significantly so. We disagree. As both parties acknowledge, the market was well aware of Ocwen's regulatory problems—the consent orders, the auditors, and the fines were far from secret, and indeed were addressed openly in Ocwen's filings, investor calls, and press releases. To the extent that the Retirement System contends that Ocwen had a duty to disclose the specifics of its technological difficulties, its position is untenable. A duty to disclose information to investors arises only when omission of that information would render misleading other information that an issuer *has* disclosed. *See Matrixx*, 563 U.S. at 44. None of the

22

statements that the Retirement System highlights here are misleading in the absence of the disclosure of REALServicing's issues because (as already explained) a reasonable investor wouldn't have regarded such corporate banalities as relevant in deciding whether to invest in Ocwen in the first place.

What's more, attending to the context of the complained-of statements, at times, actually cuts the Retirement System's argument out from under it. For example, the Retirement System's complaint highlights Ocwen's announcement that "[a]s a company we continue to make progress in resolving our legacy issues." But the complaint elides the remainder of the sentence, including the recognition that "there is more work to be done." That context matters in the materiality analysis cuts both ways.

In sum, we conclude that a number of Ocwen's statements can't be classified as material misrepresentations because no reasonable investor would have considered them in making investment decisions—in short, because they weren't material.

**B**

Other challenged statements are nonactionable for a different-but-related reason: they're opinions. The Supreme Court has explained in the analogous § 11 context that statements of opinion are generally nonactionable because liability attaches only in the case of an "untrue statement of a material *fact.*" *Omnicare*,

135 S. Ct. at 1326 (quoting 15 U.S.C. § 77k(a)).[7]  Of course, simply because a statement is couched as opinion—"I believe," "I think," or even "In my opinion"—doesn't foreclose a finding that it constitutes an express or implied misrepresentation of fact.  The Supreme Court has recognized that regardless of its wishy-washy, subjective framing, a statement of opinion can be actionable in either of two ways.

First, the Court has explained, every statement of opinion "explicitly affirms one fact: that the speaker actually holds the stated belief."  *Id.*  Thus, a statement of opinion that "falsely describe[s] [the speaker's] own state of mind" is an untrue statement of fact—as to what the speaker actually believes—and accordingly will "subject the issuer to liability (assuming the misrepresentation were material)."  *Id.*  For example, the statement "I believe that the earth is flat" may be true even if the earth is, in fact, round—but it can't be true if the speaker *actually believes* that the earth is round.  Second, the Court pointed out, when statements of opinion "contain embedded statements of fact," a speaker may be liable "if the supporting fact she

---

[7] Although neither the Supreme Court nor this Court has addressed the status of statements of opinion under § 10(b) and Rule 10b-5, in *Omnicare* the Supreme Court adopted a standard for determining whether a statement of opinion is actionable under § 11 of the Securities Act of 1933.  *See* 135 S. Ct. at 1326.  Because the core prohibition of Rule 10b-5(b) is worded in the exact same language as § 11, *see* 15 U.S.C. § 77k(a) (providing a cause of action for "any person" acquiring a security to sue the issuer and other designated individuals if the issuer's registration statement "contain[s] an untrue statement of a material fact" or "omit[s] to state a material fact . . . necessary to make the statements therein not misleading"), we conclude that *Omnicare*'s analysis controls here.

supplied were untrue." *Id.* at 1327.  So, if a CEO states that "we believe that our product, which contains a state-of-the-art 2019 gadget, is the best on the market," she can be liable if she knows that the product actually contains a refurbished 2015 gadget—in other words, if the embedded statement of fact (here, the gadget's newness) is false.  Ocwen's statements of opinion can be actionable only if they fall into one of these two buckets.  Let's see.

The Retirement System complains that Ocwen asserted, among other things, that—

- "[W]e believe that our competitive strengths flow from our ability to control and drive down delinquencies through the use of proprietary technology and processes and our lower cost to service."

- "[We] believe significant investments in our servicing operations, risk and compliance infrastructure over recent years will position us favorably relative to our peers."

- "[W]e expect the next round of results from the National Mortgage Settlement monitor to show that we have made progress in improving our internal testing and compliance monitoring."

The district court concluded that these statements—and others like them—were nonactionable because they expressed only "belie[f]" and "expect[ation]."  On appeal, the Retirement System contends that these statements violate Rule 10b-5 because they fall into the first bucket described above—*i.e.*, because Ocwen didn't actually believe them.  Here, though, the Retirement System runs into a pleading problem: its complaint fails to *allege* that Ocwen didn't believe that its efforts to improve risk management and regulatory compliance were progressing or that its

25

investment in compliance management was delivering improved results.  Nor—bucket two—did the Retirement System allege that Ocwen's statements contained embedded false statements of fact.  Although the Retirement System contends that its complaint provided a "strong inference" of falsity, none of Ocwen's statements of opinion are mutually exclusive of—or even inconsistent with—Ocwen's alleged knowledge that it had persistent software problems.  Ocwen could have believed *both* that REALServicing was a mess—even a "train wreck"—*and* that it had made progress towards compliance.

At best, the Retirement System alleged facts giving rise to an inference that Ocwen perhaps *could or should* have known that it would have difficulty improving results.  But that's not enough—under the PSLRA and our precedent, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2)(A)—*i.e.*, with an "intent to defraud or severe recklessness," *FindWhat*, 658 F.3d at 1299.  Although scienter may be inferred from an aggregate of factual allegations, it must still be alleged with respect to each alleged violation of the statute.  *Id.* at 1296.  Here, the Retirement System failed to allege facts with particularity that give rise to a strong inference that the defendants didn't truly believe what they

26

asserted in the statements in question, or that the statements embedded false facts.

Thus, Ocwen's statements of opinion aren't actionable under Rule 10b-5.[8]

## III

There's more. Several other statements, the district court found, were forward-looking statements that are immune from liability under the Private Securities Litigation Reform Act, which Congress enacted "[a]s a check against abusive litigation by private parties." *Tellabs*, 551 U.S. at 313. The Supreme Court has explained that the "PSLRA's twin goals" are "to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Id*. at 322. As a means of encouraging companies to share relevant information with the public, in part by providing a measure of protection for those disclosures, the Act includes a "safe harbor" provision that immunizes certain "forward-looking" statements from liability.

A forward-looking statement is what it sounds like—a prediction, projection, or plan.[9] The safe-harbor provision ensures that, in a private securities-fraud

---

[8] The Retirement System also argues that Ocwen should be liable for material omissions. But "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic*, 485 U.S. at 239 n.17. And disclosure of material information is required under Rule 10b-5 "only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *See Matrixx*, 563 U.S. at 43–44 (quoting 17 CFR § 240.10b–5(b)). The Retirement System doesn't allege that Ocwen had a specific duty to disclose specific information, or that anything Ocwen said created a duty to disclose anything in particular. Thus, it failed to state a claim for any material omission.

[9] To be precise:

action under Rule 10b-5, an issuer "shall not be liable with respect to any forward-

looking statement . . . if, and to the extent that"—

> (A) the forward-looking statement is—
>
>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the  forward-looking statement; or
>>
>> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge by that person that the statement was false or misleading.

---

(A) a statement containing a projection of revenues, income (including income loss),   earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph  (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) (describing a forward-looking statement as a statement of "fact only verifiable by seeing how [it] hold[s] up in the future").

15 U.S.C. § 78u-5(c)(1).  Before we consider whether any of Ocwen's statements

qualify, we need to pause to address a threshold issue.

## A

The Retirement System contends that the safe harbor doesn't apply to

several of Ocwen's statements because they were made within three years of a

cease-and-desist order regarding violations of Rule 12b-20.  *See* 17 C.F.R.

§ 240.12b-20.  To explain, the PSLRA's safe-harbor provisions won't shield a

forward-looking statement if, "during the 3-year period preceding the date on

which the statement was first made," the company on whose behalf the statement

is made "has been made the subject of a judicial or administrative decree or order

arising out of a governmental action" that "requires that the issuer cease and desist

from violating the antifraud provisions of the securities laws."  15 U.S.C. § 78u-

5(b)(1)(A)(ii).  The Retirement System asserts that Rule 12b-20 is an "antifraud

provision" such that receipt of the related cease-and-desist order—which, as a

factual matter, all agree occurred—renders the safe harbor inapplicable to any of

Ocwen's statements made in the ensuing three years.

We reject the legal premise that Rule 12b-20 constitutes an "antifraud

provision" within the meaning of the PSLRA.  Rule 12b-20 provides that "[i]n

addition to the information expressly required to be included in a statement or

report" under §§ 12(b), 12(g), 13, and 15(d) of the Securities Exchange Act of

1934 and accompanying regulations, "there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."  17 C.F.R. § 240.12b-20.  For a few reasons, we think it clear that this rule isn't an "antifraud" provision.  Most conspicuously, the Rule doesn't contain a scienter requirement.  By its very nature, an antifraud provision aims to counter fraud, and by its very nature, fraud involves intentional wrongdoing.  *See* Prosser & Keeton on Torts 728 (5th ed. 1984) ("[Fraud] entail[s] [a]n intention to induce the [victim] to act or to refrain from action in reliance on the misrepresentation.").  Rule 12b-20, however, is ambivalent as to the speaker's state of mind; it bases liability solely on the failure to "add[] such further material information . . . as may be necessary to make the required statements . . .  not misleading."  17 C.F.R. § 240.12b-20.  It makes no reference, implicitly or explicitly, to knowledge—let alone intention—that the "required statements" would be misleading absent additional "material information."  *Id.*  Indeed, the Rule would seem to apply equally to negligent (or even innocent) misreporting as to an intentional wrong.

Not surprisingly, while this Court has yet to determine whether Rule 12b-20 is an antifraud provision or a mere reporting regulation, we have hinted that it is the latter.  In *S.E.C. v. Monterosso*, we explained that a district judge had found defendants "liable for violating the antifraud provisions of the Securities and

30

Exchange Act"—which we listed in a footnote as §§ 10(b) and 17(a)(1), as well as Rule 10b–5(a). 756 F.3d 1326, 1332 & n.15 (11th Cir. 2014). We then stated *separately* that defendants had been found liable for violations of (among other things) Rule 12b–20, at least implying that we didn't consider that Rule among the ranks of the antifraud provisions. *Id.* at 1332; *see also S.E.C. v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 462 (9th Cir. 1985) (recounting the district court's finding that appellants had "violated the *registration* provisions of the Exchange Act [including] Rule 12b–20," as well as, separately, "the antifraud provisions [including] § 17(a) [and] § 10(b)"). The Retirement System points to no court that has deemed Rule 12b-20 an "antifraud provision" within the meaning of the PSLRA's safe-harbor provision, and, for the reasons explained here, we decline to become the first.[10]

**B**

Having cleared away that bit of underbrush, let's head back to the four corners of the safe-harbor provision. The provision, if you'll recall, is framed in the disjunctive—it provides three independent, alternative means of inoculating

---

[10] The Retirement System's sole support for its otherwise unsubstantiated argument is one footnoted hyperlink in its brief, leading to a mysterious document that lists Rule 12b-20 under "general antifraud provisions" rather than "disclosure and reporting obligations." Retirement System argues that the document indicates that the SEC views Rule 12b-20 as an antifraud provision and contends that this classification is entitled to deference. It's absolutely impossible to tell from the link or the brief, however, who wrote the document, when, or for what purpose. Not quite an inkblot, but close. We won't defer to so obscure a reference.

31

forward-looking statements: those that are (1) accompanied by meaningful cautionary language, (2) immaterial, or (3) made without actual knowledge of their falsity. *See* 15 U.S.C. § 78u-5(c)(1).

The first prong "requires courts to examine only the cautionary statement accompanying the forward-looking statement" and not "the state of mind of the person making the statement." *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999) (quoting H.R. Conf. Rep. 104–369, at 44 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 743). In other words, "if a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant." *Id.* The second prong provides safe harbor for immaterial statements,[11] and the third prong gives a defendant protection when the plaintiff "fails to prove" that a forward-looking statement was made with actual knowledge that the statement was false or misleading. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 n.7 (11th Cir. 1999).

After reviewing the complaint and the district court's opinion, we agree that several of Ocwen's statements—like those that follow—fall within the safe harbor:

---

[11] We won't spend much time on the immateriality prong here because materiality, as we've already explained, is an element on the merits of a securities-fraud claim. *See Basic*, 485 U.S. at 224. Despite this, the PSLRA's safe harbor also explicitly provides protection for immaterial forward-looking statements. 15 U.S.C. § 78u-5(c)(1)(A)(ii) (the immateriality sub-prong). We assume that, in most cases, an investor pointing to an immaterial statement will have failed to state a claim for securities-fraud to begin with. The PSLRA, however, seems to provide an extra layer of protection, making doubly sure that investors won't be held liable for immaterial, forward-looking statements.

- A January 2015 news release stating that "[w]e expect our ongoing cooperation [with the California Department of Business Oversight] will result in a satisfactory outcome for all parties."

- An April 2015 earnings call stating that Ocwen expected "to continue to be profitable and generate strong operating cash flow; continue to demonstrate strong corporate governance, risk management and compliance management; continue to refocus on improving operating margins in the servicing business."

- A July 2015 earnings call stating that Ocwen believed that its servicer rating "should improve to levels similar to other large servicers" and would "continue to provide strong servicing results."

The Retirement System contends that these and similar statements aren't shielded under the safe harbor because (1) some weren't accompanied by meaningful cautionary language and were knowingly false and (2) others contained false statements of *present* fact. We will consider each objection in turn.

**1**

We first consider the Retirement System's contention that the statements aren't accompanied by meaningful cautionary language. While boilerplate won't suffice, the meaningful-cautionary-language obligation "does not require a listing of *all* factors"—it's enough that an issuer mention "important factors that could cause actual results to differ materially from those in the forward-looking statement." *Harris*, 182 F.3d at 807 (citation omitted). "[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent

33

decision about it according to her own preferences for risk and reward." *Id*.; *see also Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001).

While the Retirement System doesn't dispute this premise, it asserts that none of the cautionary language in the statements here could be "meaningful" because Ocwen's technology failures—which would preclude it from properly servicing loans and achieving regulatory compliance—had already occurred. In support of its argument, the Retirement System points to a D.C. Circuit decision that held that "cautionary language cannot be 'meaningful' if it is misleading in light of historical facts that were established at the time the statement was made." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015) (internal citation and quotation marks omitted).

Certainly, cautionary language can't be "meaningful" if it is nothing more than a front for present problems. After careful review, however, we find that the warnings accompanying Ocwen's complained-of statements here were meaningful, and none the less so because some of the warned-of risks related to events unfolding in the public eye. For example, in a January 2015 news release concerning regulatory action against it, Ocwen stated that "it [wa]s fully cooperating with the California Department of Business oversight [] to resolve an administrative action dated October 3, 2014" and that, going forward, it "expect[ed] [its] ongoing cooperation w[ould] result in a satisfactory outcome for

34

all parties." Accompanying this prediction was language explaining that many of Ocwen's statements were forward-looking, and identifying "uncertainty related to claims, litigation, and investigations brought by government agencies and private parties regarding our servicing." Essentially, Ocwen disclosed a present problem (an administrative action against it), offered a forward-looking prediction (an expectation of a satisfactory outcome), and cabined its expectation with relevant cautionary language (the uncertainty that comes with agency actions and investigations).

The other challenged statements are more of the same: It was no secret that Ocwen faced ongoing regulatory action, and in each relevant disclosure Ocwen warned in some detail that it faced a serious risk of "claims, litigation, and investigations" regarding its "servicing, foreclosure, modification, origination and other practices," underscoring that the risk arose from "uncertainty related to past, present or future investigations and settlements with state regulators, the Consumer Financial Protection Bureau . . . , State Attorneys General, the Securities and Exchange Commission . . . , the Department of Justice, or the Department of Housing and Urban Development . . . ." Given the circumstances, we find this language sufficient to warn an investor "of risks of a significance similar to that actually realized" and provide adequate "notice of the danger of the investment to

35

make an intelligent decision about it according to her own preferences for risk and reward." *Harris*, 182 F.3d at 807.

**2**

We next consider the Retirement System's contention that several purportedly forward-looking statements are ineligible for safe-harbor protection because they contain false statements of *present* fact. Ocwen's multiple statements that it was "'committed' to correcting any servicing deficiencies," the Retirement System contends, "cannot be classified as 'forward-looking' because they are statements about the Company's present condition and intentions." Further, it asserts, any statements that Ocwen would "continue" to do something—continue to "demonstrate progress" toward compliance or continue to "make appropriate investments" in infrastructure, for example—focus on present rather than future circumstances.

We addressed a similar argument in *Harris v. Ivax Corporation*. There, investors alleged that a list of primarily forward-looking statements, sprinkled with a few assertions of present facts, was misleading when taken as a whole. 182 F.3d at 805–06. We held that the list fell within the safe harbor, despite the fact that it was a "mixed bag," containing "some sentences that [were] forward-looking and some that [were] not." *Id*. at 806. Key to this holding, however, was the investors' allegation that the list *as a whole* was misleading. We clarified that our holding

36

didn't give companies carte blanche to shield present statements of fact in the safe harbor, explaining that "a list or explanation will only qualify for this treatment" if any present-tense statements were limited to "assumptions underlying a forward-looking statement." *Id*. at 807. Because "[f]orward-looking conclusions often rest both on historical observations and assumptions about future events," we explained, "banish[ing] from the safe harbor lists that contain both factual and forward-looking factors . . . would inhibit corporate officers from fully explaining their outlooks." *Id.* at 806.

*Harris* provides a helpful starting point for evaluating several of Ocwen's statements. As in *Harris*, the contested statements here "rest both on historical observations and assumptions about future events." *Id*. To be sure, unlike the investors in *Harris*, the Retirement System challenges multiple individual statements rather than an entire list. That makes our job both easier and harder. On the one hand, it's easier because some of the complained-of statements are readily severable. To the extent that a lengthy statement includes distinct present-tense and forward-looking components, it makes sense to afford safe-harbor protection to the forward-looking portion (if applicable) and then evaluate the present-tense statement on its own. *See Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 692 (5th Cir. 2014) (joining "the First Circuit, Third Circuit, and Seventh Circuit in concluding that a mixed present/future statement is not entitled to the

37

safe harbor with respect to the part of the statement that refers to the present")
(footnotes and citations omitted).  This approach, we think, best effectuates the
purpose of the PSLRA, which extends safe harbor exclusively to statements that
are forward-looking in nature.  *See* 15 U.S.C. § 78u-5(c)(1).

Take Ocwen's statement that "[w]e are fully cooperating with the
Department of Business oversight[,] . . . .[and] expect our ongoing cooperation will
result in a satisfactory outcome for all parties."  The first portion—that Ocwen is
cooperating (currently, that is) to resolve a specific administrative action—is
framed entirely in the present tense and isn't entitled to safe-harbor protection
simply because it is appended to a forward-looking clause.[12]  The second portion—
the expected result of a current action—is clearly forward-looking and, as we have
already deemed the accompanying cautionary language adequate, qualifies for the
safe harbor.

On the other hand, evaluating several of the individual statements in this
case also makes our job harder.  That's because a present-tense declaration is, in
some cases, an inextricable part, rather than an easily severed ancillary, of a
forward-looking statement.  Take, for instance, the statement "we are committed to

---

[12] Had the Retirement System alleged facts giving rise to a strong inference that Ocwen was *not* cooperating with the California Department of Business oversight or had *not* dedicated substantial resources towards satisfying its requests, then this portion of the statement could become problematic.  Since it didn't, though, we move on.

correcting any servicing deficiencies"—expressing a present-tense commitment to a specific future goal.  Or the promise that Ocwen would "continue to provide strong servicing results"—implying both that servicing results are currently strong and that Ocwen commits to provide strong results in the future.  These types of statements, when accompanied by meaningful cautionary language, are properly sheltered under the safe-harbor because they convey management plans for yet-to-be-proven future operations and goals.  *See Harris*, 182 F.3d at 805 (describing a forward-looking statement as a statement of "fact only verifiable by seeing how [it] hold[s] up in the future").  It would be illogical to bar forward-looking statements from protection simply because they implicitly communicate information about the present—indeed, many plans and projections are conveyed in just this way.  "I'll leave my desk in 5 minutes" communicates that I am *presently* at work.  "I plan to study hard in order to maintain my 4.0 GPA" conveys that I *currently* have perfect grades.  Even so, these statements, like many of Ocwen's here, are intended, first and foremost, to communicate a future plan.

We do not hold today that false misrepresentations of present fact can be "smuggled" in under the cover of forward-looking statements.  We do hold, however, that when a forward-looking statement is of the sort that, by its nature, rolls in present circumstances—that is, when a statement forecasts in a tentative way a future state of affairs in which a present commitment unfolds into action—

39

the statement isn't barred from safe-harbor protection solely on that ground.   After thorough review, we conclude that Ocwen's statements are either (1) forward-looking and accompanied by meaningful cautionary language, or (2) contain present-tense statements that (for reasons already explained) are immaterial puffery or weren't alleged to be false.

* * *

We recognize, of course, a fair amount of overlap (even, perhaps, redundancy) in our discussions of puffery, opinions, and forward-looking statements—all are different routes, with different scenery, that lead to the same bottom-line question: Did Ocwen make a material misrepresentation of fact—that is, a false representation that a reasonable investor would have relied on in light of the total mix of information available?  While in many cases this multifaceted question may require jury deliberation, here its answer is clear.  There is no genuine question as to whether the statements the Retirement System points to cross the line—each is easily either not material, not alleged to be a misrepresentation, not a fact, or exempt under the PSLRA (and many statements are more than one).  Although numerous, the complained-of statements, in context, provide no information on which a reasonable investor could reasonably rely.

Accordingly, we hold that the Retirement System has failed to properly allege a material misrepresentation (or omission) and thus has failed to state a valid

claim under § 10 and Rule 10b-5.  *See Mizzaro*, 544 F.3d at 1236–37 (listing "a material misrepresentation or omission" as a required element of a securities-fraud claim under Rule 10b-5 claim) (quotation omitted).[13]

## IV

That conclusion compels the next—namely, that the Retirement System also fails to allege an actionable "control persons" violation against Ocwen officers Ron M. Farris and Michael R. Bourque, Jr. under § 20(a) of the Securities Exchange Act.  A § 20(a) claim, which imposes derivative securities-fraud liability on certain company individuals, has three elements: (1) a primary violation of the securities laws—here, allegedly, of § 10(b) and Rule 10b-5; (2) individual defendants who had the power to control the general business affairs of the company; and (3) individual defendants who "had the requisite power to directly or indirectly control

---

[13] We don't assess the materiality of statements that the Retirement System failed to allege (in its complaint) were actually false.  For instance, the Retirement System repeatedly argues in its brief that Ocwen's statements about its progress toward regulatory compliance were materially misleading because Ocwen failed to supply investors with "the undisclosed fact that [it] would not be able to remediate 'into compliance'" with the regulatory settlements.  But ongoing regulatory issues and "progress" aren't mutually exclusive ideas.  While the complaint alleges at length that Ocwen knew it had serious problems with REALServicing, it doesn't allege facts strongly supporting the inference that it was *impossible* for Ocwen to comply with the terms of the regulatory settlements by remedying REALServicing's deficiencies or switching to another software.  Similarly, the Retirement System takes issue with Ocwen's statement that it believed that it had "effective controls in place to ensure compliance with the California Homeowner's Bill of Rights and all single point of contact requirements under federal and state laws."  But the Retirement System never alleges that Ocwen *didn't* believe or couldn't have believed that it had the proper controls in place to comply with the Bill of Rights or point-of-contact requirements.  By focusing the attack on REALServicing, the Retirement System's complaint failed to allege that Ocwen's statements about internal progress or compliance were actually false.

or influence the specific corporate policy which resulted in primary liability."
*Mizzaro*, 544 F.3d at 1237 (quotation omitted); 15 U.S.C. § 78t(a).  Here, because we have determined that the Retirement System failed to adequately plead a violation of § 10(b) and Rule 10b–5, there is no underlying "primary violation" on which to hang a § 20(a) claim.

## V

Lastly, the Retirement System asserts (in summary, afterthought fashion) that Ocwen could be liable for securities fraud based on violations of SEC Rule Item 303, 17 C.F.R. § 229.303(a)(3)(ii), or generally accepted accounting principles established by the Financial Accounting Standards.  Neither argument withstands scrutiny.

Item 303 is entitled "Management's discussion and analysis of financial condition and results of operations" and falls within the SEC's "Standard Instructions for Filing Forms."  17 C.F.R. § 229.303.  The Rule requires that an issuer's filings "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *Id.* § 229.303(a)(3)(ii).  The Retirement System's reliance on Item 303 is doubly misplaced.

As an initial matter, no court of which we are aware has found a private right

of action under Item 303, and the rule itself doesn't seem to contemplate one.[14]

Moreover, and in any event, the Retirement System's assertion that a "violation of

Item 303 is actionable under Section 10(b), regardless of whether [the plaintiff] has

alleged other false or misleading statements" fails on the merits.  The disclosure

obligations imposed by Item 303 and Rule 10b-5 are materially (no pun intended)

different—the former is far more sweeping than the latter.  Item 303 requires

disclosure of any known "trend, demand, commitment, event or uncertainty" that is

likely to come to fruition, and, in the event that management can't determine the

likelihood it must nonetheless disclose unless it determines there is *no* reasonable

likelihood of material effect on the registrant's financial condition.  *See*

Management's Discussion and Analysis of Financial Condition and Results of

Operations, 54 Fed. Reg. 22427, 22430 (May 24, 1989).  Rule 10b-5, by contrast,

pegs any disclosure duty to materiality, requiring "a balancing of both the indicated

probability that the event will occur and the anticipated magnitude of the event in

---

[14] Of course, Rule 10b-5 does not itself contain a private right of action, either.  The Supreme Court, however, has long since implied a private cause of action in Rule 10b-5. *See Basic*, 485 U.S. at 231–32.  Not so for Item 303, though—and the regulation's language (to say nothing of the governing statute's language) provides no indication that it entails a private right of action. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001) (declining to find an implied private right of action in Title VI and stressing that the search for Congress's intent to provide a private right of action begins and ends with the controlling statute's text and structure).

43

light of the totality of the company activity." *Basic*, 485 U.S. at 238 (quotation omitted).

Emphasizing precisely that difference, both the Third and the Ninth Circuits have rejected the very argument that the Retirement System makes here—namely, that a violation of Item 303 automatically gives rise to 10b-5 liability.[15]  In *Oran v. Stafford*, the Third Circuit refused to hold "that even if there is no independent private cause of action under [Item] 303, the regulation nevertheless creates a duty of disclosure that, if violated, constitutes a material omission under . . . Rule 10b–5."  226 F.3d 275, 287 (3d Cir. 2000).  The disclosure requirement under Item 303, the court explained, "varies considerably from the general test for securities fraud materiality set out by the Supreme Court"—indeed, "[Item] 303's disclosure obligations extend considerably beyond those required by Rule 10b-5."  *Id.* at 288. The Ninth Circuit has likewise held that an Item 303 violation doesn't necessarily give rise to Rule 10b-5 liability.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014).  Item 303's "reasonably likely to have a material effect" standard, the Ninth Circuit said, differs from Rule 10b-5's

---

[15] So, very nearly, has at least one member of this Court.  *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 682 n.78 (11th Cir. 2010) (Tjoflat, J., concurring) (observing that when a plaintiff fails to plead "any actionable misrepresentation or omission" under Rule 10b–5, Item 303 can't salvage the suit and calling the assumption that Item 303 imposes an actionable duty to speak under Rule 10b–5 "generous").

"probability/magnitude test for materiality." *Id*. at 1055.[16] We agree. On its face, Item 303 imposes a more sweeping disclosure obligation than Rule 10b-5, such that a violation of the former does not *ipso facto* indicate a violation of the latter.

The Retirement System's GAAP-based argument fares no better. The relevant accounting principle, ASC 450/FAS 5, requires that an issuer disclose a loss contingency when a loss is a "reasonable possibility"—that is, when a loss is "more than remote but less than likely." Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, Accounting for Contingencies, para. 3, 10 (1975). The Retirement System asserts that Ocwen's "false and misleading statements and omissions" about its "purported 'progress' concerning its compliance" with the consent order and regulations "caused material and knowing violations" of GAAP.

This conclusory assertion fails to state a claim. To start, the Retirement System never explains precisely *how* Ocwen's disclosures ran afoul of GAAP.

---

[16] We note that the Second Circuit has held "that Item 303 imposes the type of duty to speak that can, in appropriate cases, give rise to liability under Section 10(b)," because, given the mandatory nature of the regulations, "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of 'known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015) (quoting § 229.303(a)(3)(ii)). That Court also acknowledged, though, that an Item 303 violation did not *necessarily* give rise to a 10b-5 violation: "[A] violation of Item 303's disclosure requirements can only sustain a claim under Section 10(b) and Rule 10b–5 if the allegedly omitted information [also] satisfies *Basic's* test for materiality." *Id*. at 103. Thus, the Retirement System's claim would fail even under the Second Circuit's more generous standard.

45

And even assuming for argument's sake that they did, an accounting violation doesn't necessarily give rise to Rule 10b-5 liability any more than an Item 303 violation does. *See Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994) (recognizing that although courts have often treated violations of financial accounting standards as "indicative" of securities fraud, "[t]he prohibitions contained in the GAAP and in Rule 10b-5" are "not perfectly coextensive").[17]

## VI

At the end of the day, the Retirement System has failed to allege an actionable violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 or § 20(a) of the Act. Accordingly, we affirm the district court's dismissal of the Retirement System's complaint.

**AFFIRMED.**

---

[17] The Retirement System contends that it should be granted leave to amend its complaint for a fourth time on remand. But the Retirement System didn't properly request leave to amend in the district court. The Federal Rules provide that such a request shall (except in circumstances that don't apply here) be made by written motion to the district court specifying the precise relief sought and the grounds therefor. *See* Fed. R. Civ. P. 7(b)(1) (emphasis added). As we have explained, "[a] motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999). Here, rather than file a motion for leave to amend, the Retirement System included its request in the memorandum filed in opposition to Ocwen's motion to dismiss but neither attached the amendment nor set forth the substance of the proposed amendment. *See id.* (rejecting a request for leave to amend for identical reasons). Accordingly, the Retirement System isn't entitled to amend its complaint.