NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

SYNC TITLE AGENCY, LLC, *Appellant*,

*v.*

ARIZONA CORPORATION COMMISSION, *Appellee*.

No. 1 CA-CV 23-0606

FILED 05-06-2025

---

Appeal from the Superior Court in Maricopa County
No.  LC2022-000275-001
The Honorable Joseph P. Mikitish, Judge
Arizona Corporation Commission No. S21131A-20-0345

**AFFIRMED IN PART, VACATED IN PART**

---

COUNSEL

Escolar Law Office, Reno, Nevada
By M. Philip Escolar
*Counsel for Appellant*

Arizona Corporation Commission, Phoenix
By Paul Kitchin
*Counsel for Appellee*

Scharf-Norton Center for Constitutional Litigation at the Goldwater
Institute, Phoenix
By Timothy Sandefur
*Counsel for Amicus Curiae Goldwater Institute*

Burch & Cracchiolo, P.A., Phoenix
By Daryl Manhart
*Co-Counsel for Amicus Curiae North American Securities Administrators Association, Inc*

North American Securities Administrators Association, Inc., Washington, DC
By Dylan White
*Co-Counsel for Amicus Curiae North American Securities Administrators Association, Inc.*

Arizona Attorney General's Office, Phoenix
By Joshua D. Bendor, Alexander W. Samuels, Luci D. Davis, Joshua G. Nomkin
*Counsel for Amicus Curiae State of Arizona*

––––––––––––––––––––––––––

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Vice Chief Randall M. Howe joined.

––––––––––––––––––––––––––

**P E R K I N S**, Judge:

**¶1**         The Arizona Corporation Commission (the "Commission") found that Sync Title Agency, LLC ("Sync") sold an unregistered non-exempt security under Arizona Revised Statutes Sections 44-1841 and 44-1844(A)(1), and committed securities fraud under Section 44-1991(A)(2). The Commission ordered Sync to pay both restitution and administrative penalties. Sync appeals the superior court's decision affirming the Commission's order.

**¶2**         Sync conceded that it sufficiently "participated" in a sale of securities under Section 44-2003(A) to subject it to liability under the Arizona Security Act (the "Security Act"). And the Arizona Constitution does not require a jury trial for alleged violations of the Security Act when brought by the Commission through internal proceedings. *EFG America, LLC v. Ariz. Corp. Comm'n*, ___ Ariz. ___, 2025 WL 1039587, at *3, ¶ 13 (App. 2025).

**¶3** We therefore address the merits of the Commission's fraud claims.

**¶4** We start by addressing the scope of Arizona's non-public offering securities registration exemption under Section 44-1844(A)(1). We conclude this sale qualified as a non-public offering under Section 44-1844(A)(1).

**¶5** We conclude by addressing each of the Commission's three claims of securities fraud under Section 44-1991(A)(2). The Commission found statements characterizing the transaction as a "slam dunk" and "fail safe" investment were fraudulent. This was error because those statements were non-material puffery. But we affirm the Commission's finding that failing to inform offerees that their investment funds would be used on personal, non-Sync related expenses was fraud. The Commission also erred by finding a statement projecting an operating timeline was fraudulent because there was a reasonable basis for believing in that projection.

**¶6** For the following reasons, we affirm the superior court's decision in part, vacate it in part, and remand to the Commission for proceedings consistent with this decision.

## FACTS AND PROCEDURAL BACKGROUND

**¶7** Rosicella Joplin and Christopher Olson are licensed real estate agents and brokers. They also jointly own a mortgage business. Megan and Marcus Williams (collectively, the "Williams") are respectively a homemaker and an auto technician. They earn additional income flipping houses. In August 2018, Joplin represented the Williams in a real estate transaction. The Williams soon became friends with Joplin and Olson, socializing together at dinners and events.

**¶8** Joplin and Olson observed that their mortgage business was often delayed by the titling process and decided to start Sync, a company to handle real estate titling transactions. In December 2018, Joplin and Olson approached the Williams about investing in Sync. They asked for a $100,000 investment in exchange for a 19.9% share of Sync.

**¶9** Joplin and Olson told the Williams that Sync would have a steady stream of income because Joplin and Olson would refer clients from their real estate and mortgage business to Sync. Because Sync would have a built-in customer base, Joplin and Olson characterized the requested investment as "fail-safe" or a "slam dunk" and represented that it would generate $6,000–7,000 per month as the Williams' profit share. Joplin and

Olson also represented that the Williams' investment funds would be used to secure office space, pay software subscription fees, and hire a title agent. At the December 2018 meeting with the Williams, Olson said Sync would be operational within a month of their investment.

¶10 The Williams agreed to invest in Sync, and Joplin and Olson drafted a purchase agreement. The Williams' attorney reviewed the agreement and informed them that the agreement contained many serious drafting issues. The Williams asked to change their investment schedule so that they would pay $50,000 up front, and the remaining $50,000 in two installments. Joplin and Olson agreed to this amendment, and the Williams did not negotiate any other changes.

¶11 The Williams reviewed the revised agreement with Sync's attorney. Sync was not a party to the agreement. Instead, Joplin and Olson sold percentages of their membership interests to the Williams. But pursuant to the agreement, the Williams transferred the funds directly into Sync's bank account.

¶12 Sync never became operational. It needed to obtain both an escrow agent license and a title agent license from the Arizona Department of Financial Institutions (the "Department"). Sync did not submit an escrow agent license application to the Department until February 2019, and never submitted a title agent license application. In April 2019, the Department responded with a deficiency letter listing five incomplete parts of the application, including a missing "Company's Audited Financial Statement, [to] ensure the net worth is $100k or more." Sync did not respond to the deficiencies and allowed its application to lapse in April 2019.

¶13 Meanwhile, Joplin and Olson used nearly all the funds from Sync's bank account on both business expenses and personal expenditures. After delays in the opening of Sync, the Williams sought multiple updates between February and June 2019 on Sync's operating status, but Joplin and Olson gave evasive or false answers. In June 2019, the Williams demanded the return of their money.

¶14 In November 2020, the Commission notified Sync, Joplin, and Olson of their opportunity for a hearing, *see* A.R.S § 44-1972, alleging they violated Section 44-1841 by selling an unregistered security to the Williams and committed securities fraud in violation of Section 44-1991. Sync, Joplin, and Olson did not dispute that they sold an unregistered security but argued the sale was an exempt non-public offering under A.R.S. § 44-1844(A)(1).

¶15        The Commission concluded that Sync, Joplin, and Olson did not meet their burden in proving the applicability of the registration exemption. *See* A.R.S. § 44-2033. Although the offering had been directly negotiated with and limited to the Williams, the Commission found the non-public offering exemption did not apply because (1) the Williams were not sophisticated investors and (2) the Williams lacked access to the kind of information about Sync that registration would have revealed.

¶16        The Commission also found securities fraud occurred when Joplin and Olson (1) told the Williams their investment would be "fail-safe" and a "slam dunk," (2) projected that Sync would be operational within a month of their investment, and (3) did not mention that some of their funds would be spent on Joplin and Olson's personal expenses. The Commission ordered Sync, Joplin, and Olson to pay, jointly and severally, $50,000 in restitution and to pay, individually, $5,000 in administrative penalties.

¶17        Sync, Joplin, and Olson appealed the order to the superior court, which affirmed the order in a signed minute entry. All three parties timely filed a notice of appeal, but Joplin and Olson failed to pay their filing fee, resulting in their dismissal from this appeal. We have jurisdiction. *See* A.R.S. §§ 12-120.21(A)(1) and 44-1981.

## DISCUSSION

¶18        On appeal, Sync argues the Commission erred in imposing administrative penalties and ordering restitution for violations of Sections 44-1991 and -1841 because (1) the Arizona Constitution guarantees a right to a jury trial for alleged violations of Section 44-1991, (2) its offering was exempt from securities registration as a non-public offering, and (3) substantial evidence does not support the Commission's findings that Sync committed securities fraud.

## I.    Sync's Participation in the Sale

¶19        The Security Act imposes liability for violations of Sections 44-1991 and 44-1841 on "any person . . . who made, participated in or induced the unlawful sale or purchase." *See* A.R.S. § 44-2003(A) (defining the scope of liability for actions under Sections 44-2001 and 44-2002); A.R.S. § 44-2001 (transactions in violation of Section 44-1841 are voidable); A.R.S. § 44-2002 (transactions in violation of Section 44-1991 are voidable). Here, the Commission found that the Sync corporate entity "participated in the transaction at issue." But Sync was not a party to the purchase contract with the Williams—in fact, the only mention of Sync in the contract was a provision that funds were to be wired to Sync at close of sale. Thus, the

threshold question in this case is whether Sync's role in the sale was enough to constitute "participation" under Section 44-2003(A).

¶20 The Commission asserted at oral argument that Sync participated in the sale to the Williams solely by accepting the funds from the transaction. We disagree—accepting funds from a securities sale, without more, is not participation for Section 44-2003(A) purposes. Rather, participation under Section 44-2003(A) "requires active involvement with a stake in the outcome, not merely an ancillary role in the stock sale." *Strategic Diversity, Inc. v. Alchemix Corp.*, 664 Fed. Appx. 660, 664 (9th Cir. 2016). Merely acting as a conduit for money exchanged in a sale is not active involvement. Participation requires something more. *See, e.g.*, *Strom v. Black*, 22 Ariz. App. 102, 103–04 (App. 1974) (appellant participated in fraudulent sale by driving buyer to meetings, persuading buyer, drafting the sale agreement, receiving funds, and taking commission from the sale); *Ventures 7000, LLC v. Ariz. Corp. Comm'n*, 1 CA-CV 21-0179, 2022 WL 320565, at *7, ¶ 34 (Ariz. App. Feb. 3, 2022) (mem. decision) (appellant participated by authoring investment proposals with language directed at investors and receiving money from those investments to operate a business).

¶21 But Sync conceded at oral argument that it did more than merely accept funds. Sync's counsel asserted that "Sync was part and parcel" of the sale to the Williams, that "Olson and Joplin, at times, at least . . . were acting on behalf of Sync," and that Sync was thus "hopelessly intertwined" in the sale such that it was "drawn into" the sale by "acting in connection with the sale of securities." By its own admission, Sync participated in the sale of securities to the Williams. Sync is therefore subject to liability pursuant to Section 44-2003(A).

## II.    Right to a Jury Trial

¶22 In June 2024, the United States Supreme Court held in *Sec. & Exch. Comm'n v. Jarkesy* that enforcement proceedings in the Securities and Exchange Commission seeking civil penalties on federal securities fraud claims violated defendants' Seventh Amendment right to a jury trial. 603 U.S. 109, 120–21 (2024). We asked the parties for supplemental briefing and invited briefs from amici to address what application, if any, *Jarkesy* has to the present case.

¶23 While this matter was pending, another panel of this Court issued an opinion concluding that "Arizona law does not grant a jury-trial right for Commission enforcement actions" initiated before the

Commission. *EFG America, LLC*, 2025 WL 1039587, at *3, ¶ 13. We agree and thus reject Sync's argument that *Jarkesy* requires a jury trial in this case.

## III.    Standard of Review

**¶24**        Because the Arizona Constitution does not entitle Sync to a jury trial, we address the merits of the Commission's security registration violation and securities fraud findings.

**¶25**        The parties dispute our standard of review under Section 12-910(F). Before 2018, Section 12-910(E) (as then numbered) instructed that we affirmed an agency action unless the action "is contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion." A.R.S § 12-910(E) (2017). In other words, the Arizona Administrative Procedure Act formerly mandated that we defer to agency decisions across the board. *See, e.g.*, *Waltz Healing Ctr., Inc v. Ariz. Dep't of Health Servs.*, 245 Ariz. 610, 613, ¶ 9 (App. 2018).

**¶26**        After amendments in 2018 and 2021, Section 12-910(F) now instructs that we will "affirm the agency action" unless we conclude that:

> the agency's action is contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion. . . . [T]he court shall decide all questions of law . . . [and] all questions of fact without deference to any previous determination that may have been made on the question by the agency.

A.R.S § 12-910(F).

**¶27**        Sync argues Section 12-910(F) applies abuse of discretion review but requires that we first decide all questions of law *de novo* and review the evidence without deference to any factual or legal determinations made by the Commission. The Commission counters that we should view the facts in the light most favorable to affirming its decision and that we have "specifically found the 2021 amendment to [Section] 12-910(F) applies only to new findings of fact made on appeal by the Superior Court and does not apply to reviewing facts found by the agency."

**¶28**        We have done no such thing. The plain language of Section 12-910(F) contradicts the Commission's argument: "the court shall decide all questions of fact without deference to any previous determination that may have been made on the question *by the agency*." A.R.S. § 12-910(F) (emphasis added). And in *Craven Constr., LLC v. Ariz. Registrar of*

*Contractors*, which the Commission cites to support its position, we did not limit our review to the factual findings of the superior court. 1 CA-CV 22-0011, 2022 WL 17592079, at *2, ¶ 12 n.1 (Ariz. App. Dec. 13, 2022) (mem. decision). We merely noted that "the superior court made no new findings of fact," *id.*, to underscore that we were directly reviewing the agency decision, as our precedent instructs us to do, *id.* at ¶ 12.

**¶29**      Our review of an agency action on appeal from the superior court is as follows. We independently review the agency action "and are not bound by the superior court's judgment because we examine the same record." *Phillip B. v. Ariz. Dep't of Child Safety*, 253 Ariz. 295, 298, ¶ 8 (App. 2022). And we do not defer to the agency when resolving challenges to "conclusions of law, factual findings, or mixed questions of law and fact." *Simms v. Simms*, ___ Ariz. ___, 2025 WL 838114, at *11, ¶ 62 (App. 2025). Rather, we conduct an independent review of the record. *Id.*; A.R.S. § 12-910(F). And we decide questions of law, including statutory interpretation, *de novo*. A.R.S. § 12-910(F); *Aroca v Tang Inv. Co. LLC*, ___ Ariz. ___, 2025 WL 953724, at *2, ¶ 12 (2025).

## IV.      Exemption From Security Registration

**¶30**      Sync argues the sale of membership interest to the Williams was exempt from registration as a non-public offering under Section 44-1844(A)(1). The parties dispute the scope of the exemption and the applicability of federal case law to that analysis.

**¶31**      Section 44-1844(A)(1) is identical to its federal counterpart, 15 U.S.C. § 77d(a)(2). *Wales v. Ariz. Corp. Comm'n*, 249 Ariz. 263, 270, ¶ 30 (App. 2020). When construing provisions of the Arizona Security Act with substantially similar provisions in the federal Securities and Exchange Act, we "follow[] settled federal securities law unless there is a good reason to depart from that authority." *Sell v. Gama*, 231 Ariz. 323, 327, ¶ 18 (2013); *see also* 1996 Ariz. Sess. Laws, ch. 197, § 11(C) (2nd Reg. Sess.) (statement of legislative intent) ("[I]n construing provisions of [the Security Act], the courts may use as a guide the interpretations given by the securities and exchange commission and the federal or other courts."). We thus consider relevant federal case law to the extent it aids our interpretation, but such cases do not dictate our analysis.

### A.      The Scope of the Non-Public Offering Exemption

**¶32**      Unregistered securities may not be sold in Arizona unless the sale fits within a registration exemption. A.R.S § 44-1841. One such

exemption is when the sale is "by an issuer not involving any public offering." A.R.S § 44-1844(A)(1).

**¶33**　　　　This non-public offering exemption "applies when those who receive stock have no practical need for the protection provided by the Securit[y] Act and registration of stocks." *Wales*, 249 Ariz. at 270, ¶ 31 (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953)) (cleaned up). "An offering to those who are shown to be able to fend for themselves is a transaction not involving any public offering." *Ralston Purina Co.*, 346 U.S. at 125 (cleaned up).

**¶34**　　　　*Wales v. Arizona Corporation Commission* is the only previous Arizona case to address the scope of the non-public offering exemption. There, we noted that a critical factor in determining the need for the registration protections is the offerees' "access to . . . the type of information proper registration would have revealed." *Wales*, 249 Ariz. at 270, ¶ 32. But other factors may be relevant, and "[federal] courts have developed flexible tests for the [non-public] offering exemption." *S.E.C. v. Murphy*, 626 F.2d 633, 644 (9th Cir. 1980).

**¶35**　　　　The parties rely heavily on *S.E.C. v. Murphy* to argue whether the offering to the Williams was non-public. *Murphy* adopted the following factors: (1) the number of offerees, (2) the sophistication of the offerees, (3) the size and manner of the offering, and (4) the relationship of the offerees to the issuer. 626 F.2d at 644–45. The parties argue extensively about the Williams' relative sophistication, but the necessarily subjective nature of the sophistication factor gives us pause. We find the Fifth Circuit's formulation in *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 900 (5th Cir. 1977) more useful.

**¶36**　　　　In *Doran*, the Fifth Circuit examined: (1) the number of offerees and their relationship to each other and the issuer, (2) the number of units offered, (3) the size of the offering, and (4) the manner of the offering. *Id.* The *Doran* court noted that "the level of sophistication will not carry the point," and that instead "the relationship between the promoters and the purchasers and the access to the kind of information which registration would disclose become highly relevant factors." *Id.* at 902 (quoting *Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 690 (5th Cir. 1971)) (cleaned up). Like the Fifth Circuit, we also decline to rely on sophistication as a determining factor.

B.     Sync's Sale to the Williams

**¶37**          Applying the *Doran* test, we conclude that Sync's sale of membership interest to the Williams was a non-public offering, and thus exempt from registration under the Security Act.

**¶38**          Sync's offering was small and limited to its purchase agreement with the Williams. The offering was informal and conducted largely via text message. Sync and the Williams directly negotiated the purchase agreement after the Williams expressed interest in investing in Joplin and Olson's mortgage businesses.

**¶39**          And critically, the record shows that the Williams were close enough with Joplin and Olson that they would have had "access to . . . the type of information proper registration would have revealed." *See Wales*, 249 Ariz. at 270, ¶ 32. The Williams had an ongoing business and personal relationship with Joplin and Olson and communicated with them regularly. The parties engaged in multiple conversations and meetings before signing the purchase agreement, during which they could have asked for an account of Sync's assets or for a proposed statement of expenditures. The Williams also represented in the purchase agreement that they had been "given the opportunity to ask questions of and to receive answers from the Company concerning its business."

**¶40**          The record also demonstrates that Sync could have produced registration-type information if the Williams had asked for it. The Commission argues Sync lacked critical financial information that would have been disclosed in the registration process, but its own witness belies its argument. The Commission's forensic accountant testified that he reviewed 1,800 pages of Sync's bank documents and credit card statements. The Commission also submitted as exhibits simplified analyses showing all deposits and withdrawals from Sync's bank account and Sync's credit card activity. Even though Sync did not disclose these documents to the Williams, the record establishes that the information was available. Importantly, the record does not indicate that the information was unavailable to the Williams before the transaction.

**¶41**          Notwithstanding the small scale and direct nature of the offering, the Commission argues that the Williams needed the Security Act's protection because they lacked sophistication. Sync disputes the Commission's characterization of the Williams' business acumen.

**¶42**          While we do not find the offeree's sophistication to be a helpful measure in evaluating whether the transaction was non-public, we

recognize that the Commission hinged its determination in significant part on this *Murphy* factor. Thus, we note that, even applying that factor, we would conclude the Williams were sufficiently "sophisticated" to "fend for themselves" in this transaction. *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1029 (4th Cir. 1997) (factors influencing investor sophistication include business background, wealth, age, education, professional status, and investment experience); *Ralston Purina Co.*, 346 U.S. at 125. Although the Commission and Sync dispute the relevance and success of the Williams' house-flipping business, at a minimum the business provided the Williams with some experience in evaluating real estate investment opportunities.

¶43　　　Viewed in its totality, the record demonstrates the sale of Sync membership interest to the Williams was a limited offering not available to the public. Before the sale, the Williams had the sort of relationship with Joplin and Olson that would have given the Williams access to the information that registration would have provided. The Williams invested in Sync after directly meeting, negotiating with, and questioning Joplin and Olson. Thus, the Commission erred in finding that the non-public offering exemption under Section 44-1844(A)(1) did not apply.

## V.　Securities Fraud

¶44　　　The Commission found Joplin and Olson made three fraudulent statements or omissions to the Williams: (1) representing that an investment in Sync would be "fail-safe" and a "slam dunk"; (2) failing to explain that Joplin and Olson would use investment funds for some personal expenses; and (3) representing that Sync would be operational within a month of investment. Fraud in the sale of a security is a direct or indirect "untrue statement of material fact" or materially misleading omission. A.R.S. § 44-1991(A)(2). An omission is "materially misleading" if, objectively, there is a "substantial likelihood that, under all the circumstances, the misstated or omitted fact would have assumed actual significance in the deliberations of a reasonable buyer." *Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 553 (App. 1986) (cleaned up).

### A.　"Fail-Safe" and "Slam Dunk"

¶45　　　The Commission argues Sync's "fail-safe" and "slam dunk" statements were fraudulent because such statements would be material to a reasonable investor, and Sync has in fact been a failure to date. But these were "puffery," or "generalized, vague, nonquantifiable statements of corporate optimism." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th

Cir. 2019). Puffery statements are not material because "[e]xcessively vague, generalized, and optimistic comments . . . aren't those that a 'reasonable investor,' exercising due care, would view as moving the investment-decision needle." *Id.* at 1320; *see In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) ("A statement is not material and is mere puffery, if it is so vague and such obvious hyperbole that no reasonable investor would rely upon it." (cleaned up)).

¶46　　　　Here, the "fail-safe" and "slam dunk" statements are precisely the sort of generalized hyperbole that Arizona courts have long held cannot support a fraud claim. *See, e.g.*, *Hall v. Romero*, 141 Ariz. 120, 123–24 (App. 1984) (rejecting fraud claim based on statement that "you'll never find a better, more secure investment"); *Ellis v. First Nat'l Bank*, 19 Ariz. 464, 471 (1918) ("[T]he law does not regard mere 'puffing' as to the value of stock as an investment the same as a false representation . . . but rather as a mere expression of opinion or 'trade talk.'"). The Commission erred by finding these statements fraudulent.

## B.　　Joplin and Olson's Personal Use of Investment Funds

¶47　　　　Joplin and Olson told the Williams that their $50,000 investment would be used to secure office space, hire a title officer, and cover expenses like commercial software. The Commission argues Joplin and Olson defrauded the Williams by failing to disclose that Joplin and Olson would withdraw and deposit the investment funds into their personal accounts and use the funds to pay off Joplin's and Olson's personal credit cards.

¶48　　　　Sync argues the omission would not be material to a reasonable buyer, *see* A.R.S. § 44-1991(A)(2); *Trimble*, 152 Ariz. at 553, because the purchase agreement stated that Sync was not a party to the agreement and that the Williams were purchasing their shares directly from Joplin and Olson. A reasonable buyer pays close attention to an agreement's language. But the agreement does not unambiguously state that the Williams' investment would become Joplin's and Olson's personal property. And the agreement required the Williams to wire their investment funds into Sync's business bank account. Reasonable investors viewing this agreement language and hearing Joplin and Olson's representation could believe the funds were Sync's property to be used only on Sync-related expenses. The record supports the Commission's finding that Joplin and Olson's use of the investment funds on personal expenses was fraudulent.

## C.        Sync's Operational Timeline

**¶49**        The Williams testified that Joplin and Olson told them at a December 2018 meeting that Sync would be operational within a month after their investment. The Commission argues this statement was fraudulent because Joplin and Olson falsely projected when Sync would become operational. A projection or statement of belief is actionable securities fraud when the declarant lacks "a reasonable basis for that belief." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).

**¶50**        The Commission argues Joplin and Olson lacked a reasonable basis for the projection because they had already written to another investor in October 2018 that "[o]ur title company that we are opening here in November is called SYNC Title Agency." But the addressee was a person Joplin and Olson interviewed to be an escrow officer. And in the rest of the letter, they discuss Sync's plans to "eventually hire on an escrow assistant . . . [and] some business development roles as well." The most reasonable interpretation of the letter is that Joplin and Olson provided a hiring timeline to a potential employee. A hiring timeline is not a projection of operations.

**¶51**        The Commission also argues Joplin and Olson's statement to the Williams lacked a reasonable basis because Sync never applied for a title agent license and did not file an escrow agent license application with the Department until February 2019, almost a month after the Williams invested. But the Commission did not introduce evidence that the timing of Sync's submissions departed from the typical application timeline. At a minimum, Joplin and Olson could have reasonably believed Sync would be approved for its licenses after submitting an escrow agent application, paying an application fee, and purchasing a surety bond. The Commission thus failed to prove Sync lacked a reasonable basis for its projection and erred by finding the projection statement was securities fraud.

## VI.    Attorney Fees

**¶52**        Sync requests its attorney fees under Section 12-348(A), which authorizes an award of attorney fees to a prevailing non-governmental party in an adjudication on the merits in a "court proceeding to review a state agency decision pursuant to . . . statute[s] authorizing judicial review of agency . . . decisions." A.R.S. § 12-348(A)(2). In our discretion, we decline to award fees.

## CONCLUSION

¶**53**        We affirm in part and vacate in part the Commission's order, and remand to the Commission for proceedings consistent with this decision.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:           JR